presumption that he left heirs—a presumption justified, in fact, by the presence in the action of his sisters. But beyond this, the plaintiff did not know more than that the law presumed as once in existence human beings, heirs of Lawrence, if he be presumed dead. Their identity, their names, were unknown. They were mere unlocated creations of a legal presumption. Now, to these technical existences the summons allotted names. As the names were unknown, the supposititious persons were given fictitious names, and described as falling in one of several classes. This followed the Code of Civil Procedure (section 451). As they were, in fact, unknown, it was stated what relation they bore to Lawrence Kelly, viz., heirs.. What other description was possible?

It is true that it was not literally stated that they were unknown, but it was substantially stated. No person could read the title without knowing beyond doubt that it was not known whether Kelly was dead or alive, and that if he was dead, his heirs, etc., were summoned. A more rational exposition of ignorance of persons is not conceivable. The court was dealing with fictions of the law, and it so appeared in the summons. They come into existence by the naked presumption of law. By it they existed unknown and unknowable, unlocated and unplaceable, unnamed and unnamable, unidentifiable—mere unconditioned figments sprung from the legal fancy that Kelly did not die without heirs. But there is no presumption that Kelly left a will or nominated an executor, or that there was an executor of his estate, or that his heirs had married or died. To conjecture such things would be to pile speculation on a legal subtlety, and raise mere phantoms to be made parties to the action. The objections give rise to idle speculations that do nothing to strengthen title, but vex by delays and suspicions.

The order should be affirmed, with $10 costs and disbursements. All concur.

---

(75 Misc. Rep. 551.)

MERCANTILE NAT. BANK OF CITY OF NEW YORK v. HEINZE et al.

(Supreme Court, Trial Term, New York County. February, 1912.)

1. SPECIFIC PERFORMANCE (§ 93*)—TIME AS ESSENCE OF CONTRACT.
   Time will not be considered as of the essence of a contract in equity, unless it affirmatively appears that the parties regarded it as an essential element of their bargain.
   [Ed. Note.—For other cases, see Specific Performance, Cent. Dig. §§ 381–390; Dec. Dig. § 93.*]

2. CONTRACTS (§ 211*)—CONSTRUCTION—TIME AS ESSENCE OF CONTRACT.
   That time is of the essence of a contract may be shown by its express terms or by the nature of the property affected, the purposes for which it is to be used, or other surrounding circumstances, all of which may be considered in determining the real intent of the parties.
   [Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 938–943; Dec. Dig. § 211.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

3. SPECIFIC PERFORMANCE (§ 93*)—TIME AS ESSENCE OF CONTRACT—INTENTION OF PARTIES.

Where on the proper construction of 'a contract the intention of the parties is established, it will be enforced in equity as fully as at law, in the absence of a recognized ground for equitable intervention.

[Ed. Note.—For other cases, see Specific Performance, Cent. Dig. §§ 245–248; Dec. Dig. § 93.*]

4. CONTRACTS (§ 211*)—CONSTRUCTION—TIME AS ESSENCE OF CONTRACT.

Where corporate stock, presumably of more or less fluctuating value, is transferred by a contract differing materially from the usual contract of sale of securities, and providing that a previous agreement of adjustment between the parties is continued in force, modified by inserting "July 1, 1909," in place of "January 1, 1909," and that in consideration of the extension of the previous agreement the party of the second part is authorized at any time, with or without advertisement, notice, or demand, to sell any or all of the securities, time is of the essence of the contract.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 938–943; Dec. Dig. § 211.*]

5. CONTRACTS (§ 211*)—CONSTRUCTION—CONSTRUCTION BY PARTIES.

Where parties to a contract, in consideration of its extension, gave the right to sell securities at any time, such a sale was not inconsistent with the contention that the time limits set by the contract had expired.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 938–943; Dec. Dig. § 211.*]

Action by the Mercantile National Bank of the City of New York against Otto C. Heinze and others. Case tried on defendants' counterclaim. Counterclaim dismissed.

Sullivan & Cromwell (Francis D. Pollak, of counsel), for plaintiff.
Ferdinand E. M. Bullowa, for defendants.

PENDLETON, J. This action is at law to recover some $450,000 on certain alleged promissory notes. The answer, among other things, sets up by way of counterclaim a cause of action in equity for the specific performance of a certain contract or contracts by plaintiff to release and discharge the notes referred to in the complaint. The present proceeding is a trial of the counterclaim. On and prior to October 14, 1907, the bank, the plaintiff in this action, was the holder of notes of the defendants aggregating a very large amount. On that day Otto C. Heinze, one of the defendants, made an arrangement with an officer of the plaintiff for a further loan of $500,000 to be secured by certain collateral. On the strength of this arrangement two notes of the defendants, for $400,000 and $100,000, respectively, were sent to the bank, and on or about the following day, October 15th or 16th, certain securities, being the collateral agreed upon, were also sent to the plaintiff bank by the defendants. The bank did not discount the notes or credit the defendants in their account with the proceeds thereof, but did certify checks of the defendants to the amount of some $400,000, and on or about the same day credited defendant's account with $500,000 represented by a cashier's check for that amount drawn to the order of one F. A. Heinze, indorsed by F. A. Heinze and also by defendant's name put on with a rubber stamp by their bookkeeper. The circumstances of this alleged deposit and whether with

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

the knowledge of the defendants or when they were first informed that the notes sent by them to the bank had not been discounted are matters of some dispute. The securities sent on the 15th or 16th day of October to the bank, as above mentioned, have been designated in the evidence as the "disputed collateral." Defendants were at the time, or became shortly thereafter, financially embarrassed, and on or about October 21, 1907, a petition in bankruptcy was filed against them by certain of their creditors, in which, among other things, the delivery to the plaintiff bank of the above-mentioned securities was relied on as an illegal preference and an act of bankruptcy. Defendants appeared in the proceedings and denied the allegations of the petition. Pending these proceedings and before any adjudication, and in or about October, 1907, a receiver in bankruptcy was appointed. Thereafter, and during the winter and summer of 1908, negotiations were pending between the defendants and their creditors looking to a settlement of their affairs, and a formal plan or agreement of reorganization in writing was submitted to the creditors for their consideration, which provided, among other things, for the organization of a corporation to be called the Western Development Company to take over and administer the assets of defendant's firm on certain terms and conditions therein set forth. Such was the general situation when in the early part of October, 1908, one of defendants wrote to the bank and its attorney to the effect that some agreement for adjustment of their affairs must be arrived at before October 17th or they would lose their Stock Exchange seat; that they had practically arranged with their important creditors and the others could be dealt with; that plaintiff's claim was the only large one not arranged for, and unless some basis of settlement with plaintiff could be arrived at by October 17th, the whole adjustment would fail, and the bankruptcy proceedings have to be carried through to a conclusion, and calling plaintiff's attention to the claim of the receiver and creditors to the "disputed collateral"; and that unless the bankruptcy proceedings were gotten out of the way plaintiff might lose the collateral. After some negotiations, the agreement of October 16th was executed, a copy of which is as follows:

"Otto C. Heinze & Company. Arthur P. Heinze. Memorandum of adjustment. (1) Bankruptcy proceedings must be dismissed so as to leave Otto Heinze & Company and A. P. Heinze free to contract. (2) Otto Heinze & Company must release and relinquish to the Mercantile National Bank all securities now held by the bank as security for the indebtedness of Otto Heinze & Company to the bank and vest in the bank a good title to all such securities free from any and all claims of partners, creditors or others. The following is a list of the securities, viz.: 13,150 shares United Copper common, 820 shares United Copper preferred, 1,900 shares American Ice, 1,000 shares Ohio Copper, 1,500 Butte Coalition. They must also recognize that the indebtedness of Otto Heinze & Company to the bank is $529,749.15, with interest from December 17, 1907. (3) The bank is also to receive $100,000 par value of the preferred stock of the Western Development Company, not as collateral, but as the property of the bank. (4) Upon the signature of this memorandum the bank will consent to the dismissal of the pending bankruptcy proceedings against the firm of Otto Heinze & Company, and upon the performance prior to January 1, 1909, of the conditions and agreements set forth in the foregoing first, second, and third paragraphs of this memorandum the bank will release the firm of Otto Heinze & Company from its indebtedness

to the bank.  (5) All details and agreements must be satisfactory to Sullivan & Cromwell.  (6) This memorandum does not contemplate a release by the bank of the indebtedness to it of Arthur P. Heinze, but in consideration of the release to be given by the bank to the firm of Otto Heinze & Company, as hereinbefore provided, Arthur P. Heinze recognizes that his indebtedness to the bank is $59,526, with interest on $60,000 from September 30, 1907, to October 19, 1907, and that the bank holds as collateral for said indebtedness the following securities, viz.: 3,000 shares United Copper common, 10,000 shares Barnes King.  (7) By signing this memorandum the bank in no way recognizes that the receiver or trustee in bankruptcy of the firm of Otto Heinze & Company has any interest in the securities above mentioned.  We hereby approve the foregoing memorandum and basis of adjustment, and hereby agree to do any and all acts and execute any and all papers necessary to give effect to the same when and as soon as the pending bankruptcy proceedings against Otto Heinze & Company and A. P. Heinze are dismissed.

"Dated New York, October 16, 1908.  Arthur P. Heinze, Max H. Schultze, The Mercantile National Bank of the City of New York, Miles M. O'Brien, V. P."

In December, 1908, the Western Development Company was incorporated, and shortly thereafter a formal meeting of the directors was held and resolutions adopted providing for the issue of stock in exchange for property, contracts, etc.; but no instruments of transfer or assignment were executed until long subsequent thereto and to any date or dates herein mentioned.  On the 11th day of February, 1909, some question having arisen in a conversation between one of the defendants and the attorney for the bank as to whether the agreement of October 16, 1908, was still in existence or had expired by limitation, the attorney for the bank sent a letter, of which the following is a copy:

"February 11, 1909.

"Arthur P. Heinze, Esq., 42 Broadway, New York, N. Y.—Dear Sir: As counsel for the Mercantile National Bank we delivered to you last October a consent to the dismissal of the bankruptcy proceedings brought against the firm of Otto Heinze & Company and a memorandum dated October 16, 1908, looking to an adjustment of the indebtedness of your firm to the bank.  The adjustment was conditioned upon the performance of its terms by you and your partners prior to January 1, 1909, and the agreement has expired by its terms.  We call your attention to this fact in view of the statements which were made the other day to Mr. Pierce that it was your recollection that the agreement did not contain a time limit, and in order that you and your partners may not assume that the agreement is in force or that our client, the Mercantile National Bank, now consents to the dismissal of the bankruptcy proceedings.  Should you desire to propose any new arrangement or to obtain the consent of the bank to the dismissal of the proceedings we shall be glad to submit to the bank any proposal you have to make regarding the same.

"Yours very truly,        Sullivan & Cromwell."

Thereafter and on February 18, 1909, the agreement of that date was executed as follows:

"This memorandum, made and entered into this 18th day of February, 1909, by and between Otto C. Heinze, Max H. Schultze and Arthur P. Heinze, now or recently doing business as copartners under the firm name of Otto Heinze & Company, individually and as such copartners, parties of the first part, and the Mercantile National Bank of the City of New York, party of the second part, witnesseth: That the parties hereto hereby consent, covenant and agree that the agreement of adjustment entered into by and between them, bearing date October 16, 1908, be, and the same hereby is, continued in force from and after the time of the execution of this memoran-

dum, it being understood and agreed that the said adjustment agreement be, and the same hereby is, modified and amended by inserting in the fourth paragraph thereof the words 'July 1, 1909,' in the place of the words 'January 1, 1909.' And, further, in consideration of the extension of said agreement by the party of the second part the parties of the first part hereby authorize the party of the second part, at any time, with or without advertisement, notice or demand, each of which is hereby expressly waived, to sell, either at public or private sale, any or all of the securities mentioned in paragraph 2 of said agreement of October 16, 1908, and to apply the proceeds of such sale on account of the indebtedness mentioned in said paragraph of said agreement. Such sale may be made for cash or upon credit, and upon such terms as to payment or otherwise as to the party of the second part in its discretion may seem desirable, and on such sale the party of the second part may itself become the purchaser of said securities. In the event of such sale, however, made privately or upon the credit of the purchaser, the party of the second part shall be required to credit upon such indebtedness the full market value of any and all the securities so sold. In the event of such sale, however, the parties of the first part shall still have the right upon delivery of the preferred stock of the Western Development Company and upon the performance of the other terms of said agreement of October 16, 1908, to receive from the party of the second part a release and satisfaction of the indebtedness mentioned in the second paragraph of said agreement of October 16, 1908, as provided in said agreement. In witness whereof, the parties hereto have executed this memorandum in duplicate the day and year first written. The Mercantile National Bank of the City of New York, Wm. G. Nash, President. Arthur P. Heinze, Max H. Schultze, Otto C. Heinze."

On July 15, 1909, a certificate of 1,000 shares of the Western Development Company's stock was handed to and left with an officer of the bank. Some correspondence ensued between the attorney for the bank and the defendants, or one of them, and thereafter, on or about the 4th day of August, 1909, said certificate was returned. On the 9th day of September, 1909, a decree was entered in the bankruptcy proceedings holding that the allegations made by the creditors had not been proved and denying the petition that the defendants be adjudicated bankrupts and dismissing the proceeding. On the 23d day of September, 1909, the plaintiff bank, after notice to the defendants, sold at public auction some portion of the disputed collateral; the proceeds being credited by the bank on its alleged claim against defendants. Part of the securities so sold were apparently bought in by and on behalf of the plaintiff bank. On behalf of the plaintiff it is contended: (1) That the contract lapsed by failure of the defendants to fully perform by the date fixed. That time was of the essence, and any performance or attempted performance thereafter was too late. (2) That defendants had failed to show performance at any time. That the bankruptcy proceedings were not dismissed or procured to be dismissed by defendants, but through plaintiff's efforts. That the reorganization plan was not accepted by creditors, and the stock of the Western Development Company tendered was not the stock contemplated. That the company was not organized as provided by the reorganization plan and was not invested with the rights and properties provided for by such plan. Defendants, on the other hand, contend that in a court of equity time is not of the essence; that defendants have expended or caused to be expended large sums relying on the agreement and to carry it out; that the plaintiff has received the substantial consideration bargained for; that complete perform-

ance was made or tendered within a reasonable time; that plaintiff was not injured by the failure to completely perform by the day fixed, and after the default acted on the agreement and has taken advantage of and received the benefits thereof; that the stock of the Western Development Company was the stock intended; that the company was organized in accordance with the plan, and all the rights and properties have been transferred to it as contemplated; and that on well-settled equitable principles defendants are now entitled to be relieved of the default and to have specific performance of the agreement to release their indebtedness decreed.

[1] The legal propositions applicable to these questions are well settled. Where a definite time is fixed by the terms of the contract, the general rule at law is that time is of the essence of the contract unless a contrary intent affirmatively appears. In equity the reverse is the case, and in equitable actions, as a rule, time will not be considered of the essence of the contract unless it affirmatively appears that the parties regarded time as an essential element of their bargain.

[2] Such intention may be shown by the express provisions of the contract making time of the essence, or may be evidenced by the nature of the property, the subject-matter of the contract, the purposes for which it is to be used or other surrounding circumstances, all of which may be considered to throw light on the language used and enable the court to determine what the *real intention* of the parties was. Whether or not time is of the essence is equally a question of construction at law and in equity. The reason for the difference is that at law no interest or title passes as a rule under an executory contract until the performance or tender, whereas in equity an interest is deemed to have become vested as soon as the contract is executed and the fixing of a time for payment of the consideration or performance by the other party is deemed prima facie formal and not of the essence of the transaction. It is to this divergence in the viewpoint from which the contract is regarded that the difference in the rule of construction is due.

[3] A court of equity no more than a court of law can make a new contract for the parties. Once the proper construction determined and the intention of the parties established, at law and in equity alike, the parties are held to their agreement, and it will be enforced in equity as fully as at law in the absence of some one of the recognized grounds for equitable intervention. In the early case of Secombe v. Steele, 20 How. 94, 15 L. Ed. 833, the Supreme Court of the United States stated the rule and the reason for it in language that has received approval in numerous decisions. Campbell, J., says:

"At law, if there is an express agreement for the payment of the purchase money and the delivery of the conveyance of land by a particular day and at a particular place, the parties will be bound by it, and time will be of the essence of the contract. But in equity the estate bargained and agreed to be sold becomes the property of the purchaser so soon as the agreement is concluded. * * * In the ordinary case of the purchase of an estate the assignment of a particular day or a specified place for the perfection of the title is considered as merely formal, the general object of the contract being the sale of an estate for a given sum, and the stipulation signifying that the purchase shall be completed promptly and in a reasonable manner, regard

being had to the circumstances of the case and the nature of the title and property. Time may be made of the essence of the contract by express stipulation, or it may become essential by considerations arising from the nature of the property or the character of the interests bargained."

In Parkin v. Thovald, 16 Beat. 59, the Master of the Rolls said:

"A contract is undoubtedly construed alike both in equity and at law; nay, more, a court of law is the proper tribunal for determining the construction of it. But courts of equity make a distinction in all cases between that which is a matter of substance and that which is a matter of form; and if it finds that by insisting on form the substance will be defeated, it holds it to be inequitable to allow a person to insist on such form and thereby defeat the substance."

In Stinson v. Dousman, 20 How. 461, 466, 15 L. Ed. 966, the same justice, speaking for the court, said:

"But *if the parties have declared in their contract that time is a material consideration and have agreed that their rights shall depend upon a scrupulous fidelity to their engagements, it does not belong to that court (i. e., court of equity) to make another law for the parties.*"

In Holgate v. Eaton, 116 U. S. 33, 40, 6 Sup. Ct. 224, 29 L. Ed. 538, and Brown v. Guar. Trust Co., 128 U. S. 414, 9 Sup. Ct. 127, 32 L. Ed. 468, the rule was reaffirmed.

The authorities in this state are to the same effect (Hun v. Bourdon, 57 App. Div. 351, 68 N. Y. Supp. 112):

"In an action to compel the specific performance of a contract for the sale of real estate, time is not of the essence of the contract unless in the agreement it is clearly and expressly stipulated that it shall be so. The mere insertion in the contract of a day for its completion does not make such time the essence of the contract, and it will not be implied as essential except where the subject of the sale has a fluctuating value, or where the object of the contract is a commercial enterprise, or the delay in completion would involve one of the parties in a serious loss. When time is not by stipulation or implication of the essence of the contract, a court of equity will disregard it and decree specific performance when an action at law has been lost by default of the party seeking performance, if it be conscientious that the agreement be performed. The fact that the party may not have an action at law is a reason for a decree for specific performance."

In Schmidt v. Reed, 132 N. Y. 108, 30 N. E. 373, the court says:

"*The parties to a contract may by its terms make the time of its performance essentially important and its observance in that respect requisite to relief*"—citing Benedict v. Lynch, 1 Johns. Ch. 370, 7 Am. Dec. 484.

Fry on Specific Performance:

"Time is originally of the essence of the contract in view of a court of equity *whenever it appears to have been part of the real intention of the parties* that it should be so, and not to have been inserted as a merely formal part of the contract."

In Grey v. Tubbs, 43 Cal. 359, the contract contained the following:

"In the event of the failure to comply with the terms hereof, etc., the party of the first part shall be released from all obligations in law or equity to convey, etc., and said party of the second part shall forfeit all right thereto."

Rhodes, J., says:

"It would be difficult to express with greater clearness and certainty than the parties did in this contract that the time is of the essence of the contract.

* * *   *Courts of equity have not the power to make contracts for the parties nor to alter those which the parties have deliberately made.*"

Pollock on Contracts, p. 627:

"The rule of equity which now is the general rule of English jurisprudence is to look at the whole scope of the transaction to see whether the parties really meant the time named to be of the essence of the contract. And if it appears that though they named a specific day only for the act to be done that which they really meant was a reasonable time, then this view will be acted upon."

Clark on Corporations, p. 409:

"*Courts of equity look into the intention of the parties so as to ascertain whether in fact the performance of the contract by one party was meant to depend upon the other's promise being fulfilled by the day named or whether a day was named merely to secure performance within a reasonable time.* If the latter was found to be the intention, equity would not refuse to enforce the contract, if the promise was performed within a reasonable time."

While the equitable rule has found its more frequent expression in relation to contracts for the sale of real estate, its application is by no means limited to such contracts, but, on the contrary, is equally applicable to others (Thacker Wood & Mfg. Co. v. Mallory, 27 Wash. 670, 68 Pac. 199; Man. Life Co. v. Patterson, 109 Ky. 624, 60 S. W. 383, 22 Ky. Law Rep. 1282, 53 L. R. A. 378, 95 Am. St. Rep. 393; Page, Cont. § 1160), with this distinction, that as the nature of the property, the situation of the parties, and the circumstances surrounding the making of the agreement may be looked to as aids in construction, the generally more fluctuating value of personal property, especially of stocks and similar securities and the difference in the customary methods and purposes of dealing therein, tend to show that time in such cases is more frequently intended to be of the essence than in real estate transactions. Attention is called by counsel to a class of cases which may be designated as "option agreements," where the contract is a species of unilateral contract giving the promisee the right or option on performance by a fixed date. In these the courts have held that time is of the essence and performance within the time an essential condition precedent in equity as well as at law. These cases in no way conflict with, but are in fact illustrative of, the rule. The promisee having assumed no obligation to perform, action on his part being only optional, no equitable interest has vested, and the courts have from such circumstances drawn the inference as a canon of construction that it was the intention of the parties in such cases that time was of the essence.

[4] The question is, therefore, in every case, What did the parties intend? The foregoing propositions are in reality only rules or canons of construction for the purpose of determining such intent. The contract in the case at bar does not relate to the sale and purchase of real estate. It is not an option, as the defendants assumed obligations thereunder, and, while it involves the transfer of title to or an interest in stocks presumably of more or less unstable or fluctuating value, it differs very materially from the usual contract of sale of securities. If applying to it the rule of equity that time will not be deemed of the

essence unless such affirmatively appears to have been the intention, we concede, for the purposes of the argument, without, however, deciding, that as to the contract of October 16, 1908, time would not be considered of the essence, and that if defendants had performed or made a valid tender of performance within a reasonable time, although subsequent to January 1, 1909, a suit brought by them for specific performance would not have failed by reason of such default. When we consider the second contract of February 18, 1909, a very different question is presented. It appears by the evidence that after January 1, 1909, the date fixed by the terms of the first agreement, and before the making of the second contract, a conversation occurred between one of the defendants, A. P. Heinze, and Mr. Pierce, the attorney for the plaintiff bank, in which the expiration of the time limit of January 1, 1909, and its effect was discussed, in which conversation Mr. Heinze contended there was no time limit, while the latter, Mr. Pierce, insisted the contract had by limitation expired. It further appears that thereafter Mr. Pierce wrote to A. P. Heinze the letter of February 11th above referred to. Thereafter the second contract was signed by the parties. It provided that the agreement of adjustment bearing date of October 16, 1908, *"is continued in force from and after the time of the execution of this memorandum,"* and that said first adjustment agreement be, and is, *"modified and amended by inserting in the fourth paragraph thereof the words 'July 1, 1909,' in place of the words 'January 1, 1909;'"* and further on:

"In consideration of the extension of said agreement by the party of the second part the parties of the first part hereby authorize the party of the second part at any time, with or without advertisement, notice or demand * * * to sell * * * any or all of the securities," etc.

Construing this agreement in the light of surrounding circumstances, as we should and must, it seems clear to demonstration, in view of the letter referred to above and which must have been in the minds of the parties, that the language was advisedly intended to express the acceptance by defendants of the construction contended for by Mr. Pierce that time was of the essence of the bargain. The words *"continued in force"* from and after the date of the execution of this memorandum and *"extension of said agreement"* are an express recognition that the first agreement had lapsed or expired, and the insertion of the new date for the old without further change of phraseology can only have meant that the same accepted construction was to apply to the new arrangement. Considering the language used in the light of Mr. Pierce's letter, it is tantamount to an express provision in the contract that time should be deemed of the essence, and must, I think, be regarded as conclusive evidence of the intention of the parties and, therefore, under the authorities cited, controlling. This disposes of the principal contention in the case. The second contract provided that:

"In consideration of the extension of said agreement by the party of the second part the parties of the first part hereby authorize the party of the second part at any time to sell," etc.

This language can have but one meaning, and that is the giving eo instanti by the execution of the agreement of a perpetual authority to sell, so far as the defendants were concerned, in exchange for an extension of the time limit for performance by defendant of the other provisions of the bargain. That such sale should not by making it impossible for defendants to comply with the provision of the first contract, which required absolute title to these securities to be vested in the bank, defeat plaintiff's right to a release, the contract went on to provide that:

"*In the event of such sale the parties of the first part shall still have the right, etc., upon performance, etc., \* \* \* to receive from the party of the second part a release,*" etc.

That is, notwithstanding such sale and the omission, therefore, to give the bank title to the securities, the defendants, on compliance with the other provisions, would be entitled to a release. It is urged that the word "still" in the above paragraph of the second contract should be construed as an extension of the time limit, and to mean that if at any time the securities were sold by the bank defendants would be entitled to a release on doing or causing to be done the other things called for irrespective of the time provision. It is contended, in the same way, that the sentence in the second paragraph, "*upon delivery of the preferred stock of the Western Development Company,*" no date being mentioned, and the wording of the last clause in the first agreement in which the parties agree "*to do any acts, \* \* \* when and as soon as*" the pending bankruptcy proceedings are dismissed, are all to be construed without reference to the time provision of the contract. It is well settled, however, that all provisions of an instrument are to be taken together and construed in harmony, the one with the other, and effect given to all. It cannot be overlooked that all the parties to this transaction are men of great and long experience and well versed in affairs and accustomed to deal with large and complicated business matters, especially those connected with banking loans, notes and securities dealt in on exchanges or at money centers. The defendants have been for years engaged in business as bankers or brokers and are familiar with the language of contracts of this general character, and the obligation and import of contractual engagements, and naturally keenly alive to the importance of precision in language used to express such engagements. In such case there can be no injustice done in assuming that the parties understood and intended that their contract should be construed as strictly and accurately expressing their intentions. Some evidence was given as to conversations alleged to have been had with defendant A. P. Heinze on June 30, 1909, in which it is claimed he asked for an extension of the time limit and also some negotiations claimed to have been carried on by him or suggestions made subsequently as to settling or adjusting plaintiff's claims against defendants, and it has been suggested this evidence tends to show the understanding of the parties that the arrangement lapsed on the day fixed. In arriving at the conclusion herein reached, I have given no weight to such testimony; even if true exactly and to the full extent claimed by plaintiff, it does not seem to me to throw any

light on the question involved, and to be just as consistent with one view of the contract as the other.

[5] But even if time is of the essence of the contract, it is urged on behalf of the defendants that plaintiff by selling the securities after July 1, 1909, has waived it. The rule is well settled that the right to specific performance will not be defeated if the other party after the default has waived it, and such waiver will be implied if he has done any act or taken any steps which makes its insisting on such failure to perform within the time inequitable or unjust. In Cheney v. Libby, 134 U. S. 78, 10 Sup. Ct. 498, 33 L. Ed. 818, it was held that even if time were of the essence by express provision of the contract, the failure to perform within the time will not in every case defeat the right to specific performance, and that the discretion which a court of equity has in granting or refusing specific performance may and must often be controlled by the conduct of the party, who bases his refusal to perform upon the failure of the other party to strictly comply with its conditions. If before default he has misled his adversary, or lulled him into fancied security in failing in strict performance, or after the default exercised any right or secured any benefit inconsistent with the claim of default, or to which he would not be entitled if the omission of his adversary to perform is held effective, it is well settled he will be deemed to have waived the default. If, therefore, plaintiff, in selling the securities, asserted and availed itself of any right inconsistent with the contention that defendant's right to relief expired on the day fixed, the contention would be well founded; but this is not the case. As above pointed out, by the terms of the contract it was provided, and such was the intention of the parties, that in exchange for the extension of time defendants consented, so far as their rights were concerned, to a sale at any time. Such sale was not, therefore, inconsistent with the contention that the time limit had expired.

There were many other questions discussed; but, in view of the conclusion herein stated, it is unnecessary to consider them further. The counterclaim must be dismissed.

Counterclaim dismissed.