**RED ROCK COMMODITIES, LTD.,**
**Plaintiff–Appellant,**

v.

**STANDARD CHARTERED BANK,**
**Defendant–Appellee.**

**Docket 97–7426.**

United States Court of Appeals,
Second Circuit.

Argued Dec. 10, 1997.

Decided March 30, 1998.

---

Norma B. Levy, Duker, Barrett & Gravante, New York City, for Appellant.

Stanley L. Lane, Otterbourg, Steindler, Houston & Rosen, New York City, for Appellee.

Before: OAKES, PARKER and WOOD, Jr.*, Circuit Judges.

* The Honorable Harlington Wood, Jr., Senior Circuit Judge of the United States Court of Appeals for the Seventh Circuit, sitting by designation.

1. On June 16, 1997 defendant Standard Chartered Bank moved to dismiss this appeal by plaintiff Red Rock alleging Red Rock lacked authority to bring the suit. Red Rock was incorporated in Delaware, but forfeited its corporate charter on January 6, 1998, and failed to pay its franchise taxes in New York where it did business. Standard, however, failed to raise this issue in district court and we consider it waived.

WOOD, Jr., Circuit Judge:

This diversity case was argued, by agreement of the parties, on cross motions for summary judgment, and by stipulation the district court was permitted to decide the case on the record as supplemented. This agreed procedure was intended to avoid any possible triable fact issues not otherwise resolvable by summary judgment.[1] The case involves the interpretation of a loan agreement between plaintiff-appellant Red Rock Commodities, Ltd. (Red Rock) of Delaware, together with its Israeli associate, Olges Ltd., and defendant-appellee Standard Chartered Bank (Standard) of New York. Red Rock brought this $137,000,000 lender liability suit against Standard which after argument and consideration of the record was dismissed by the district court. Red Rock appeals.

▮▮▮ Under *Anderson v. City of Bessemer City, North Carolina*, 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985), the "clearly erroneous" standard of review controls our consideration of the factual findings of the district court even though based upon a documentary record. We are not permitted to find the district court's findings of fact to be clearly erroneous if the findings are one of two permissible views of the evidence. 470 U.S. at 574, 105 S.Ct. at 1511–12. Likewise, Fed.R.Civ.P. 52(a) provides for the same standard and states in relevant part: "[f]indings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous...."

## FACTUAL BACKGROUND

As the district court began its statement of the facts so do we: "[t]his case features the unlikely prospect of a plaintiff suing a bank that was defrauded by the criminal activity of plaintiff's president, Menachem Pri–Har."[2]

2. Mr. Pri–Har in 1994 was convicted of twenty-four counts of fraud, two of which were directly related to the transaction in securing the wheat loan from Standard at issue in the present case. He is serving a fourteen-year sentence. Red Rock's Executive Vice President pled guilty to a conspiracy in the wheat loan transaction.

In September 1991 Standard agreed, at the request of and for the benefit of Red Rock, to establish credit in the amount of $5,000,000 to permit Red Rock to fund certain transactions in Israel. One of those transactions is referred to as the Steel Credit. In turn, Red Rock gave Standard a promissory note for $5,000,000 backed by a security interest in all of Red Rock's real and personal property. Letters of credit were then issued by Standard to Red Rock. However, that credit was not enough to satisfy Red Rock for very long.

In 1992 Mr. Pri–Har sought additional funding from Standard in the nature of a bridge loan to help Red Rock in a new Israel venture, the Israeli Emergency Wheat Program ("IEWP"), which Red Rock sought to operate under a contract with Israel. As operator of the program Red Rock was to purchase the entire Israeli wheat production of approximately 240,000 metric tons, and at the same time maintain in Israel a wheat stockpile of not more than 170,000 metric tons. The purpose of the IEWP was to purchase and maintain an emergency stockpile of wheat for Israel's needs. The IEWP provided for a sell-off of the wheat reserves commencing in January 1993.

It was Mr. Pri–Har's story to Standard that, although he already had lined up some of the $60,000,000 needed to finance the IEWP, he now needed an additional $12,000,000 on an expedited basis. The transaction, as Pri–Har explained to Standard, had to be with an Israeli company, Olges, because Israel, under the IEWP, could do business only with an Israeli company. Olges was also an affiliate of Red Rock. This additional money was needed immediately, it was explained, to permit Olges to meet its wheat purchase obligations. Olges had signed an IEWP contract with the government of Israel and the Israeli farmers who were to supply the wheat in June, 1992. Before advancing the additional financing, Standard required Red Rock to make a substantial payment on one of its prior Standard loans, in particular, the Steel Credit. Subsequently, Red Rock paid over $2,000,000 to Standard, or a little less than one-half of the Steel Credit outstanding balance at the time. Red Rock also sought to enlist Standard to serve as lead manager for Red Rock's idea of putting together a syndicate of banks which would provide longer term financing to substitute for the short term bridge loans of Red Rock. Standard declined Red Rock's invitation.

The Reimbursement Agreement at issue here was then entered into between Standard and Red Rock along with Olges. The resulting loan is referred to by the parties as the Bridge Loan because of its interim purpose. Accordingly, Standard issued a $12,000,000 letter of credit to Olges in July, 1992. The Reimbursement Agreement in pertinent part provided as follows:

> The Borrowers [i.e., RRC and Olges] shall reimburse [SCB] for the amount of any payment under the Letter of Credit on or prior to the day which is 90 days after such payment is made or, if sooner, upon the execution of and availability of extensions of credit under, any new credit facility which is extended to either Borrower with respect to the purchase of wheat with an amount available equal to or in excess of $12,000,000 (it being understood that[SCB] shall have no obligation to lead or extend any such facility ... and, in any event, immediately upon the release by the Bank of, or any other disposition of or receipt of proceeds with respect to, any Specific Collateral).

Their business relationship did not go well. In August 1992 Standard sought information about the payment of the balance of the Steel Credit which was due that month. Red Rock claimed as an excuse for its delay in making the payment to Standard that the steel company in which Red Rock held a security interest "had disappeared." Since the steel company failed to make its required payment to Red Rock, which Red Rock had counted on using to in turn pay Standard, Red Rock's payment to Standard was delayed. No additional information about Red Rock's Steel Credit payment was forthcoming from Red Rock. That prompted Standard in November, 1992 to notify Red Rock that Red Rock was now in default on both the Steel Credit and the Bridge Loan. Standard promptly sued Red Rock in the Southern District of New York and secured a judgment in excess of

$15,000,000. Red Rock retaliated with this present suit.

The issue in Red Rock's suit is whether the $12 million dollar Bridge Loan by Standard to Red Rock became due ninety days after the loan was extended as Standard claims, or instead became due no sooner than one year after the date of the loan as Red Rock claims. Red Rock argues that an internal document, which Red Rock characterized as a "credit application," should have been considered by the district court before it dismissed the suit, but was not. In any event the loan was not repaid by Red Rock.

## ANALYSIS

█ Red Rock contends that the Bridge Loan repayment under the Reimbursement Agreement was not due until the necessary business arrangements had been completed by Red Rock enabling it to repay the Bridge Loan from the proceeds of sales from the Israeli wheat stockpile. Those stockpile sales could not begin, however, until January 1993 so Red Rock claims repayment of the Bridge Loan was never intended, contemplated or possible until the stockpile proceeds became available to Red Rock.

To support its interpretation of the Reimbursement Agreement, Red Rock argues that the ninety-day maturity for repayment was applicable only if Red Rock was able to secure "take-out financing." That was a reference to the syndication of banks Red Rock had proposed, but in which Standard had refused to take part. Red Rock further asserts that various other loan agreements and evidence were all integrated and interrelated and should have been considered by the district court in determining the maturity date of the $12 million dollar loan, and not just the Reimbursement Agreement itself.

Red Rock further argues that the Reimbursement Agreement, by its terms, could not have intended a maturity ninety days from the actual date of the loan because the Agreement's terms contemplated the sale of "specific collateral." That collateral was, Red Rock claimed, the wheat required to be stockpiled under the IEWP. Red Rock argues that since none of the stockpiled wheat

could be sold until after January 1993, only a later maturity date could have been intended.

The district court pointed out in response to those arguments that Red Rock was required to purchase the entire Israeli wheat harvest. This generally amounted to 230,000 to 240,000 tons of wheat. Under the Wheat Purchase Agreement, Red Rock was required to stockpile at most 170,000 tons of wheat. Any additional wheat, even if not included in the agreement as collateral, was available for sale by Red Rock in time for Red Rock to use the proceeds to help in repaying the Bridge Loan. Although Red Rock pointed out that the actual Israeli wheat harvest was less than anticipated that season, this is irrelevant to the parties' intentions at the time the loan was made. The district court concluded that the Reimbursement Agreement did not give Red Rock any basis for its expansive debt maturity interpretations. The inflexible ninety-day provision is the only repayment provision in the Reimbursement Agreement.

In coming to this conclusion, the district court found that the Reimbursement Agreement incorporated all the other credit documents and security arrangements delivered by Standard to Olges or Red Rock as well as any other credit applications made to the bank along with related documents. It, therefore, embodied the entire agreement of the parties as a fully integrated document. Red Rock, however, sought to introduce the affidavits of banking experts and additional evidence to explain away the specific terms of the Reimbursement Agreement as ambiguous and to put the agreement in a different perspective favorable to Red Rock as a matter of banking practice. The district court found this effort of Red Rock to be meritless in the absence of any agreement ambiguity. We also find no ambiguity in the Reimbursement Agreement. The court found that Red Rock's proffered extrinsic evidence was not only barred by the parol evidence rule, but its value in interpreting the Reimbursement document was greatly exaggerated by Red Rock and would not, in any event, have made a difference even if admitted and considered.

█ It is for the court, as a question of law, to make the determination of whether or not a contract is ambiguous. *See Curry Road Ltd. v. K Mart Corp.,* 893 F.2d 509, 511 (2d Cir.1990) (holding that whether a con-

tract term is ambiguous is a question of law). A contract is not ambiguous where there is no reasonable basis for a difference of opinion. *Id.* The use of experts in this area is limited. *See, e.g., Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 589–90, 113 S.Ct. 2786, 2794–95, 125 L.Ed.2d 469 (1993). The district court did not need the experts' advice as to how the case should be decided. *See, e.g., Marx & Co. v. Diners' Club, Inc.,* 550 F.2d 505, 510 (2d Cir.1977) (finding expert testimony on law unnecessary and superfluous because of the special legal knowledge of the judge). Red Rock's proffered experts' affidavits were neither admissible nor needed by the district court.

Another justification the district court found for Standard's declaration of default was Red Rock's defiance of another provision of the Reimbursement Agreement. Red Rock was required to provide Standard access to its books and records pertinent to their business transactions. Red Rock's negative conduct, in relation to the Steel Credit, was a separate ground for declaring a default. Under the circumstances, however, this additional basis Standard had for declaring a default was unnecessary.

Other arguments of Red Rock are similarly without merit and do not deserve further consideration. All of Red Rock's arguments were carefully sorted out and considered by the district court as fully set forth in its well-reasoned Memorandum Opinion of January 21, 1997 supported by its findings of fact and conclusions of law. The district court was fully justified in dismissing Red Rock's suit with prejudice.

Being fully in agreement with the district court in all respects we affirm the dismissal with prejudice.

AFFIRMED.

