**TRANS PACIFIC LEASING CORPORATION,**
Plaintiff,

v.

**AERO MICRONESIA, INC., Defendant.**

**No. 98 Civ. 7466 (LAK).**

United States District Court,
S.D. New York.

Nov. 24, 1998.

Brooks R. Burdette, Matthew B. White, Sami B. Groff, Schulte Roth & Zabel LLP, New York City, for Plaintiff.

David M. Kirstein, Ralph G. Blasey, III, Samuel L. Hendrix, Baker & Hostetler LLP, William M. Brodsky, Jonathan Mazer, Baden

Kramer Huffman & Brodsky, P.C., Washington, DC, for Defendant.

## OPINION

KAPLAN, District Judge.

The dispositive question in this contract dispute is whether the lease pursuant to which defendant Aero Micronesia, Inc. ("AMI") has rented a Boeing 727–200 cargo jet from plaintiff Trans Pacific Leasing Corporation ("TPL") requires that the aircraft be operated by a third party, Ryan International Airlines, Inc. ("Ryan"), or instead permits AMI itself to fly the plane. The Court finds that TPL is correct in asserting that the aircraft may be flown only by Ryan.

### I

This seemingly straightforward issue of contract interpretation, as so often is the case, is best understood in its broader commercial context.

#### A. The Parties

Plaintiff TPL is a Nevada corporation with its principal place of business in Santa Barbara, California, and is an affiliate of Santa Barbara Aerospace, Inc. ("SBA"). The record discloses little more about these entities.

AMI is a corporation organized under, and having its principal place of business in, the Territory of Guam.[1] It is part of a group owned and controlled by the Tan family through a network of six trusts. The trusts own Tan Holdings Corporation ("THC"). THC in turn owns Consolidated Transportation Services, Inc. ("CTSI"). Until June 1998, AMI and Asia Pacific Airlines, Inc. ("APA") both were subsidiaries of CTSI. On June 20, 1998, however, APA was merged with and into AMI in circumstances described below. As far as the record discloses, CTSI now owns 92.5 percent of the voting stock of AMI with the balance owned by Michael Quinn, AMI's president.[2]

The Tan family has extensive business interests in the western Pacific. Although there is no evidence in the record concerning the group's overall size, THC alone reportedly had a net worth of more than $82 million at the end of 1997.[3] The Tan Group is engaged in garment manufacturing[4] and operates a tuna fishing fleet in the Federated States of Micronesia (the "FSM"),[5] perhaps among other enterprises, although it never has been in the air transport business or operated any aircraft prior to the events that give rise to this action. It has had a somewhat checkered past.[6]

#### B. The Genesis of the Aircraft Lease

Tuna fishing is a significant industry in the FSM, with 45 to 50 tons of fresh fish shipped weekly from Pohnpei to Guam and Saipan in the Northern Mariana Islands for transhipment to Japan.[7] It is logical to infer that the Tan-controlled fleet accounts for some part of those shipments, although the point ultimately is not material.

In the spring of 1996, the aircraft that flew the tuna catch from Pohnpei to Guam and Saipan was operated by Ting Tai.[8] The Tan group was interested in replacing Ting Tai,

---

1. Cpt ¶ 3; Ans ¶ 3. Jurisdiction is properly based on diversity of citizenship, as 28 U.S.C. § 1332(d) provides that the word "States," as used in Section 1332, includes territories. Venue is properly laid in this district by consent of the defendant. Def. Mem. Ex. A, § 19.1.

2. Def. Mem. Ex. J, at 2–3.

3. Def. Mem. Ex. B (Quinn Decl.), ¶ 3.

4. Defendant's Exhibits in Opposition to Plaintiff's Motion for a Temporary Restraining Order ("Def. TRO Exs."), Ex. 3, at 8.

5. Burdette Supp. Aff. Ex. 8.

6. In 1991, L & T International Corp. ("L & T "), a Tan company, pleaded *nolo contendere* to a charge of violating the federal false statements statute, 18 U.S.C. § 1001, in the United States District Court for the Northern Mariana Islands. Three family members, L & T, and other Tan controlled companies, in a related matter, entered into a consent judgment with the Department of Labor in 1992 to settle charges of violations of the Fair Labor Standards Act. Def. TRO Exs., Ex. 3, at 8–9.

7. Burdette Supp. Aff. Ex. 8.

8. Burdette Second Supp. Aff. Ex. A, at 83 (Chui Dep.).

formed AMI in April 1996 [9] and entered into the aircraft lease that is the subject of this action. The transaction was structured in a manner designed to give the government of the FSM an interest in the arrangement,[10] evidently to make the Tan interests more attractive to it than Ting Tai. AMI leased the aircraft from SBA, TPL's predecessor in interest, and subleased it to the National Fisheries Corporation ("NFC") of the FSM. NFC in turn subleased the aircraft to Ryan, which was to operate the plane.[11] Since AMI secured the lease at issue here, its primary mission has been to fly fresh tuna from the FSM, the Republic of Pelau and the Marshall Islands to Saipan and Guam.[12]

## C. Negotiation of the Head Lease

The lease between SBA and AMI (the "Head Lease") is dated May 3, 1996 [13] and, as indicated, is part of a package of back-to-back agreements that put AMI into the tuna flying business. The package includes as well the sublease from AMI to NFC,[14] the sub-sublease from NFC to Ryan,[15] and an air services agreement between NFC and Ryan pursuant to which Ryan agreed to fly the aircraft on routes designated by NFC.[16] It is important to recognize that, at the time these documents were negotiated, neither AMI nor

any other Tan entity was qualified to operate an aircraft of this nature.[17]

### 1. The First Draft

The earliest draft of the Head Lease in the record,[18] which is dated March 20, 1996, contemplated a lease of the aircraft by SBA to CTSI. It was prepared by SBA's counsel. Section 7.1, which is the pivotal provision, then read in relevant part:

"Lessee covenants and agrees that, during the Term:

\*    \*    \*    \*    \*    \*

"(c) Lessee is, and shall remain so long as it shall be Lessee under this Lease, duly qualified to operate the Aircraft under applicable Law and Lessee shall cause each Permitted Sublessee which will operate the Aircraft to be, and remain so long as it shall be a Permitted Sublessee under a Permitted Sublease, duly qualified to operate the Aircraft under applicable Law." [19]

Thus, Section 7.1(c), as initially drafted, contemplated the possibility that CTSI, then the proposed lessee, would operate the airplane. In addition, there were other provisions of the draft that, AMI argues, contemplated actual operation by the lessee, all of which are discussed in more detail below.[20]

---

**9.** Def. Mem. Ex. J, at 3.

**10.** As an AMI vice president testified, the object of inserting NFC in the chain of subleases was political:

"Q   Why did you want to use National Fisheries back in the spring of '96?   A Because of the politics of the situation.
"Q   Tell me about that.   A Well, there was another operator in there that we were previously using that was a private operator, and they—the government just wanted to have some kind of involvement in the airplane.   So we figured it would be a good thing to have it through National Fisheries Corporation instead of doing it on our own.   We did think about it, but we figured it would be better to do it through National Fisheries Corporation."
Burdette Second Supp. Aff. Ex. A, at 83 (Chui Dep.).

**11.** Ryan derives no economic benefit from the arrangement apart from a fixed monthly fee. Burdette Aff. Ex. 6 (Quinn Aff. ¶ 5).

**12.** Id. ¶ 4.

**13.** Burdette Aff. Ex. A.

**14.** Id. Ex. C.

**15.** Id. Ex. D.

**16.** Id. Ex. E.

**17.** See Burdette Supp. Aff. Ex. 4 (Quinn Dep.), at 50–52.

**18.** There is no evidence that there was an earlier version.

**19.** Burdette Supp. Aff. Ex. 6, at 25.

**20.** Id. §§ 4.2(a)(ii) (representation and warranty by lessee that "it or the Permitted Sublessee that will operate the Aircraft" is and will remain duly certificated as an air cargo carrier under U.S. law); 5.3 (covenant that lessee or, in the case of a Permitted Sublessee, the Permitted Sublessee "shall use ... the Aircraft ... solely in commercial operations for which" appropriate authority has been obtained); 19.15 (truth-in-leasing clause).

When Michael Quinn, who negotiated the Head Lease on behalf of the Tan interests, received this draft, he made two changes relevant here. First, he struck CTSI as the lessee and replaced it with AMI, which had been incorporated after the draft was prepared.[21] Second, and more important for present purposes, he wrote "no" in the margin next to Section 7.1(c) and altered it by hand so that it read as follows:

"(c) Lessee is, and shall remain so long as it shall be Lessee under this Lease, duly [qualified to operate the Aircraft under applicable Law] and Lessee shall cause each permitted Sublessee which shall operate the Aircraft to be, and to remain so long as it shall be a Permitted Sublessee under a Permitted Sublease, duly qualified to operate the Aircraft under applicable Law."[22]

Quinn explained that he made these notations "[b]ecause at that time CTSI was not qualified to operate the airplane."[23]

### 2. The Second Draft

The next draft that appears in the record, also prepared by SBA's counsel, is dated April 17, 1996. The relevant portion of Section 7.1 was changed in this draft in a manner consistent with a recognition that the lessee, now changed from CTSI to AMI, was not qualified to operate the aircraft:

"Lessee covenants and agrees, that during the Term:

\*   \*   \*   \*   \*   \*

"(c) Ryan International will operate the Aircraft and will remain, so long as it shall be a Permitted Licensee under a Permitted Sublease, duly qualified to operate the Aircraft under applicable Law."[24]

When Quinn received this draft, he inserted by hand following the words "Ryan International" the phrase "or other operator"[25]

for the avowed purpose of giving AMI "some flexibility ... in the case Ryan, for whatever reasons, was not able to operate this airplane."[26] He conveyed that comment to his opposite number at SBA.[27] But SBA rejected Quinn's suggestion, as Section 7.1(c) of the executed Head Lease is identical to the version in the April 17, 1996 typewritten draft.

### 3. The Final Version

As indicated, the final, executed version of the Head Lease contained the April 17, 1996 version of Section 7.1(c). None of the other provisions relied upon by AMI as suggesting the possibility of operation of the aircraft by the lessee were altered in any material respect from the first draft to the final version.

### 4. Alleged Discussions Concerning Possible Operation by AMI

TPL has devoted considerable attention to the question whether there was any discussion during the negotiation of the Head Lease concerning the possibility that AMI, although not then qualified to operate the airplane, later might become qualified and, if so, whether AMI then would have the right to do so.

SBA's chief negotiator, Richard Lykins, now no longer employed by SBA, has submitted a declaration stating that he determined that Ryan was to operate the aircraft and that the purpose of Section 7.1(c) was to require that Ryan do so "for the duration of the Head Lease."[28] Indeed, he states that he understood that AMI could operate the plane if it later became qualified only if the lessor agreed to amend the Head Lease,[29] although he does not say in so many words that the point actually was discussed with AMI.

AMI's Quinn testified that he had a lengthy conversation with Lykins concerning

---

21. *Id.* at 1.

22. *Id.* at 25.

23. Burdette Supp. Aff. Ex. 4 (Quinn Dep.), at 50–51.

24. *Id.* Ex. 7, at 22.

25. *Id.*

26. *Id.* Ex. 4 (Quinn Dep.), at 55.

27. *Id.; see also* Kramer letter, 11/12/98, exhibit (Quinn Dep.), at 57–58.

28. Burdette Supp. Aff. Ex. 1 (Lykins Decl.), ¶ 4.

29. *Id.* ¶ 5.

who would operate the aircraft if Ryan lost its certification or breached its agreements. The conclusion, he said, was that SBA would have to approve of any new operator but that it did not object to AMI operating the aircraft if it became qualified.[30]

In view of Quinn's interlineation of the phrase "or other operator" in the second draft of Section 7.1(c) and the inherent logic of the situation, the Court accepts that there was a discussion of what would happen if Ryan no longer were to operate the aircraft. But Quinn acknowledged that SBA quite reasonably "would want to have approval of who exactly is operating the airplane." [31] As no one could operate the plane without meeting all necessary governmental requirements, Quinn's statement necessarily admits that SBA wanted approval rights even as among legally qualified candidates. There simply is no reason to believe that the same considerations would not have led it to insist upon the right to approve or disapprove of AMI operating the plane should AMI eventually qualify, especially as AMI was a newly formed entity and part of a group with no prior aviation experience. Additionally, it is significant to note that Quinn has significant personal interests at stake here. He is president and owns 7.5 percent of the stock of AMI and, at this point, quite plainly bears significant animosity toward Ryan.[32] Lykins, on the other hand, no longer is employed by SBA.

In all the circumstances, the Court finds that the question of who would operate the aircraft if Ryan for some reason could not did arise. The explicit understanding between Lykins and Quinn was that SBA would have the right to approve or disapprove any proposed replacement. If the subject of AMI operating the aircraft came up at all, which the Court thinks unlikely,[33] the agreement was that it could operate the airplane only if it became qualified *and* the lessor agreed to amend the Head Lease, which it was not obliged to do. The Court does not credit Quinn's assertion that SBA agreed that AMI could operate the airplane were it to qualify to do so.

## D. The Controversy Develops

The present controversy appears to have its roots in mid–1997 after NFC authorized an engine overhaul of the Aircraft. AMI took the position that TPL, which had taken an assignment of the Head Lease from SBA and now stands in SBA's shoes, was obliged to pay for this work and pressed for payment, but TPL disputed the point.[34] While for a brief period in late 1997 and early 1998 it appeared that AMI and TPL would resolve the matter, the promise of a deal was not borne out by events.[35]

In November 1997, AMI told NFC that it would look into the possibility of taking over and operating the airplane itself.[36] In early 1998, its sister company, APA, applied to the Department of Transportation ("DOT") for certificates to provide interstate air transportation of property and mail and to engage in

---

**30.** Kramer letter, 11/12/98, exhibit (Quinn Dep.), at 58–61.

**31.** *Id.* at 60.

**32.** Burdette Supp. Aff. Ex. 4 (Quinn Dep.), at 179–80 (characterizing Ryan's actions as "hostile, astounding and outrageous").

**33.** Indeed, AMI's George Chui, while claiming that he discussed with Lykins the Tan group's alleged ambitions eventually to obtain certification to operate aircraft, admitted that he never had any discussion about the possibility of AMI operating this aircraft. Second Supp. Burdette Aff. Ex. A (Chui Dep.), at 82–91. Chui admitted also that, prior to April 10, 1998, there were no concrete plans to do anything in this regard with one exception discussed below. *Id.* at 91.

**34.** Def. Mem. Ex. B (Quinn Decl.) ¶¶ 11–12; *see id.* Ex. B to Ex. B (letter, Richard E. Lykins to George Chui, dated Dec. 12, 1997) (referring to differences as to interpretation of the lease).

**35.** Def. Mem. Ex. B (Quinn Decl.) ¶¶ 12–14.

In April 1998, TPL commenced an action in this Court for a declaratory judgment that it was not obliged to pay for engine repairs in excess of the amounts contained in certain reserves. *Trans Pacific Leasing Corp. v. Aero Micronesia, Inc.,* 98 Civ. 2804(LAK).

**36.** Burdette Second Supp. Aff. Ex. A (Chui Dep.), at 82.

foreign charter cargo transport.[37] While those applications were pending, the Tan group prepared a sublease by which AMI purportedly subleased TPL's aircraft to APA.[38] Although AMI now claims that the AMI–APA sublease was merely a proposal for which it intended to seek TPL's permission, the sublease was dated April 10, 1998, executed, and sent to TPL without any explanation.[39] TPL thereupon objected to the sublease.[40]

At that point, the Tan group found itself in a difficult position. APA had applied to DOT for certificates necessary to operate the aircraft but TPL had exercised its right to object to the sublease of the aircraft to APA. In consequence, in June 1998, the Tan group merged APA into AMI in an effort to eliminate any need for a sublease and thus to remove TPL's objection as an obstacle to the Tan group's plan to operate the aircraft itself.[41]

Neither TPL nor Ryan, which presumably saw the handwriting concerning its future at the hands of the Tan group on the wall, took this lying down. In August 1998, they filed papers with the DOT opposing the AMI applications on the ground that the aircraft was subject to the Ryan sublease through May 16, 1999 and that AMI had failed accurately to disclose that fact.[42] AMI rejoined that the Head Lease gave it the right to operate the aircraft itself once it obtained the necessary certificates and that it had the right to repossess the aircraft because NFC had defaulted on its sublease payments.[43] In September 1998, DOT tentatively concluded that the dispute concerning AMI's right to use this aircraft should not delay certification proceedings.[44] And on October 5, 1998, DOT issued the interstate charter certificate sought by AMI.[45]

By that time, NFC was substantially in arrears in its rental payments under its sublease. There is some reason to believe that the Tan group was at least partly responsible for NFC's default, as a local newspaper quoted the president of NFC as attributing its late payments to the fact that "another Tan Holdings subsidiary that runs a fishing fleet in the FSM failed to live up to a previously agreed volume of tuna to put in the plane." [46] But that issue need not be decided here. Suffice it to say that AMI, armed with the DOT certificate, moved promptly to terminate the NFC sublease, which in turn would terminate Ryan's sublease from NFC, and set itself up in the airline business.

On October 15 and 16, 1998, AMI issued a notice of default to NFC, informed Ryan that it had terminated the AMI–NFC sublease, and seized the aircraft when it landed in Saipan.[47] This in turn set off a round of litigation of which this action has become the focus.

### E. The Litigation

#### 1. AMI's Kansas Action

Immediately upon its seizure of the aircraft, AMI sued Ryan in the United States District Court for the District of Kansas to obtain possession of maintenance records and other documents relating to the plane. It sought a temporary restraining order requiring that the records be turned over immediately on the theory that AMI needed the records to operate the aircraft under FAA regulations.[48] Three days later, TPL sought leave to intervene. On October 20, 1998, Judge Marten denied TPL's motion and required that Ryan turn the records over to AMI. The court recognized that TPL had a

37. Def. Mem. Ex. B (Quinn Decl.) ¶ 15; Def. Mem. Ex. J, at 2.

38. Burdette Second Supp. Aff. Ex. A (Chui Dep.), at 30–32, & Ex. B.

39. Id.

40. Id. at 37.

41. Def. Mem. Ex. J, at 2.

42. Id. at 2, 6.

43. Id. at 6.

44. Id. at 7.

45. Id. Ex. K.

46. Burdette Supp. Aff. Ex. 8.

47. Def. Mem. Ex. B (Quinn Decl.) ¶ 19.

48. Burdette Aff. Ex. 6.

significant interest in the issue, but concluded that the dispute between AMI and TPL more appropriately would be brought in a different jurisdiction.[49]

While all this was going on, TPL, on October 19, 1998, gave notice to AMI that its failure to continue Ryan in operation of the aircraft constituted a breach of Section 7.1(c) of the Head Lease and, if it continues for more than thirty days, would be an Event of Default permitting TPL to terminate the lease.[50] TPL thus expressed its intention to terminate the lease on November 18, 1998 unless AMI cured this alleged breach.[51]

### 2. This Action

TPL filed this action on October 22, 1998, the day before Ryan was required to turn the aircraft records over to AMI. The complaint asserts four counts. Count I asserts that AMI's termination of Ryan constituted and, in any case, that operation of the airplane by AMI would constitute, a breach of the Head Lease and seeks an injunction barring AMI from operating the plane. Count II alleges that the conditions in which AMI was storing the plane were unsuitable and seeks an injunction barring AMI from preventing Ryan from taking proper steps to store the airplane properly. Count III seeks to enjoin AMI from altering, amending, or destroying the aircraft records or transporting them outside the continental United States. Finally, count IV prays that the Court declare that if AMI fails to remedy its alleged breach of the Head Lease on or before November 18, 1998, TPL will be entitled to exercise any of its rights and remedies for an Event of Default including, *inter alia*, termination of the Head Lease and retention of amounts held as reserves. It simultaneously sought a temporary restraining order and a preliminary injunction.

On the same day, after hearing presentations from both sides, this Court issued a temporary restraining order enjoining AMI from operating the aircraft, from prohibiting Ryan to take action to store the aircraft properly on Saipan, and from altering, amending, disturbing or destroying the aircraft records or transporting them out of the continental United States. It set the preliminary injunction motion down for hearing on November 18, 1998. On November 6, 1998, the Court extended the temporary restraining order for an additional ten days.

Discovery then went forward on an expedited basis, and AMI filed certain counterclaims. On November 17, 1998, the parties stipulated that, as to (1) all issues raised in the complaint and (2) so much of the counterclaims as present the issue whether AMI may operate the aircraft, (a) the trial on the merits would be consolidated with the preliminary injunction motion, (b) trial by jury would be waived, and (c) the Court would decide on the motion record as if a full trial had been held. They waived trial by jury on any remaining issues raised by the counterclaims as well, but reserved the right to engage in subsequent proceedings thereon.[52]

Accordingly, the case was tried on November 18, 1998 on a record including affidavits, declarations, deposition transcripts, and other documents. On November 19, 1998, the parties stipulated to the continuation of the temporary restraining order until the earlier of December 4, 1998 or the filing of this decision and agreed that TPL would not seek to terminate the Head Lease until such time on the basis of the previously served notice of default.

### II

The first question presented here is whether the Head Lease, as TPL claims, prohibits operation of the aircraft by anyone other than Ryan. It is useful to begin by setting out the principles that prescribe the Court's approach to this determination.

The logical starting point is identification of the universe of evidence against which the contract is to be construed. Here we have a lengthy, written contract which recites the parties' agreement that it is a complete inte-

---

**49.** *Id.* ¶¶ 6–7 & Ex. 4.

**50.** Cpt ¶ 34; Ans ¶ 34.

**51.** *See* Cpt ¶ 36.

**52.** Stipulation and order, Nov. 17, 1998.

gration of their bargain.[53] In consequence, the parol evidence rule prohibits consideration of evidence extrinsic to the contract itself to vary, contradict, add to or explain its terms.[54] If the Head Lease is ambiguous, however, parol evidence is admissible to help explain the ambiguity.[55]

### A. Is the Head Lease Ambiguous?

■ The question whether a contract is ambiguous is one of law.[56] New York courts[57] frequently resolve this question "by reference to the contract alone,"[58] although there is substantial support for the view that "evidence of the context in which a contract was executed always is admissible because words, whatever their apparent clarity, take on meaning from the circumstances in which they are used."[59] In either case, the existence of ambiguity depends upon whether there is reasonable basis for difference of opinion as to the meaning of the contract.[60]

In this case, analysis begins with the words of Section 7.1(c) itself. As indicated above, the pertinent language is as follows:

"Lessee covenants and agrees, that during the Term:

\*  \*  \*  \*  \*  \*

"(c) Ryan International will operate the Aircraft and will remain, so long as it shall be a Permitted Licensee under a Permit-

ted Sublease, duly qualified to operate the Aircraft under applicable Law."

AMI contends that the only logical reading of this language is that Ryan will be the aircraft's operator as long as it is (1) a Permitted Sublessee under a Permitted Sublease, and (2) duly qualified to operate the plane under applicable law. It submits that this is the plain meaning of the language and notes that Ryan ceased to be a Permitted Sublessee under a Permitted Sublease when AMI terminated the AMI–NFC sublease. In addition, it contends that other provisions of the Head Lease contemplate the possibility that AMI would operate the aircraft, thus supporting its argument that Section 7.1(c) permits it to do so in the event Ryan no longer is both a Permitted Sublessee and duly qualified. As any contract should be construed as a whole and, whenever possible, to give effect to all of its provisions,[61] the Court turns first to the other clauses of the Head Lease upon which AMI relies.

■ Two of the clauses relied upon by AMI manifestly are irrelevant. It points first to the Head Lease's covenant of quiet enjoyment, Section 19.11.[62] A covenant of quiet enjoyment does not enlarge the rights granted to the lessee by the lease. It is simply a promise by the lessor that it will not interfere with the rights granted.[63] It does not aid in determining what those rights are.

---

53. Def. Mem. Ex. A, § 19.7.

54. E.g., Red Rock Commodities, Ltd. v. Standard Chartered Bank, No. 94 Civ. 8555(LAK), 1997 WL 23179, at *3 (S.D.N.Y. Jan. 22, 1997), aff'd, 140 F.3d 420 (2d Cir.1998); Fireman's Fund Ins. Cos. v. Siemens Energy & Automation, Inc., 948 F.Supp. 1227, 1233 (S.D.N.Y.1996); Marine Midland Bank–Southern v. Thurlow, 53 N.Y.2d 381, 387, 442 N.Y.S.2d 417, 419, 425 N.E.2d 805 (1981).

55. E.g., Investors Ins. Co. of Am. v. Dorinco Reins. Co., 917 F.2d 100, 104 (2d Cir.1990); Fireman's Fund Ins. Co., 948 F.Supp. at 1233.

56. Red Rock Commodities, Ltd., 140 F.3d at 423–24.

57. The Head Lease contains a New York governing law clause. Def. Mem. Ex. A, § 19.1.

58. Burger King Corp. v. Horn & Hardart Co., 893 F.2d 525, 527 (2d Cir.1990) (collecting cases); accord, Hanson v. McCaw Cellular Communications, Inc., 881 F.Supp. 911, 916–17 (S.D.N.Y. 1995), aff'd, 77 F.3d 663 (2d Cir.1996).

59. Fireman's Fund Ins. Co., 948 F.Supp. at 1233 (collecting authorities); see also, e.g., Arias v. Mut. Central Alarm Serv., Inc., 182 F.R.D. 407 (S.D.N.Y.1998); Hanley v. Lark Deli Corp., 2 F.Supp.2d 534, 537 (S.D.N.Y.1998); Hanley v. Sevilla Rest. & Bar, No. 96 Civ. 3193(LAK), 1997 WL 30954, at *2 (S.D.N.Y. Jan. 24, 1997).

60. Red Rock Commodities, Ltd., 140 F.3d at 424; Burger King Corp., 893 F.2d at 527.

61. See, e.g., Galli v. Metz, 973 F.2d 145, 149 (2d Cir.1992); Ins. Co. of North Am. v. ABB Power Generation, 925 F.Supp. 1053, 1059 (S.D.N.Y. 1996); Reefer & Gen. Shipping v. Great White Fleet, 922 F.Supp. 935, 940 (S.D.N.Y.1996); Chemical Bank v. Aff. FM Ins. Co., 815 F.Supp. 115, 119 (S.D.N.Y.1993).

62. Def. Mem. Ex. A, § 19.11.

63. See, e.g., Dolman v. U.S. Trust Co. of N.Y., 2 N.Y.2d 110, 118, 157 N.Y.S.2d 537, 138 N.E.2d 784 (1956); Baitzel v. Rhinelander, 179 A.D. 735, 742, 167 N.Y.S. 343 (1st Dept.1917).

Nor does Section 19.15,[64] the so-called truth-in-leasing clause, the substance of which must appear in every aircraft lease of this character by virtue of 14 C.F.R. § 91.23 (1998). In relevant part, it provides that:

> "During the term of each Permitted Sublease, the Permitted Sublessee will be in operational control of the aircraft; at all other times during the term of this lease lessee will be in operational control of the aircraft. Lessee hereby certifies that it understands its responsibilities should it become responsible for the operational control of the aircraft during which time it will be maintained under Federal Aviation Regulations Part 91."

AMI contends that the Head Lease thus clearly contemplates that it will operate the aircraft and that TPL's proposed construction of Section 7.1(c) must be rejected because it would render the quoted portion of the truth-in-leasing clause meaningless. Once again, however, AMI's reading of Section 19.15, while plausible, is not the only reasonable interpretation.

The premise of AMI's argument regarding this clause is that one who has "operational control" of an aircraft necessarily flies the airplane. But the Federal Aviation Regulations implemented by Section 19.15 define "operational control" as "the exercise of authority over initiating, conducting or terminating a flight." [65] They define "operate" to mean "use, cause to use or authorize to use aircraft ..." [66] Hence, it is perfectly plain that the premise of AMI's argument concerning Section 19.15 is incorrect.

The other two clauses upon which AMI relies are relevant but far from conclusive. The first of them is Section 5.3, which is a covenant by AMI that "AMI shall use (or in the case of a Permitted Sublease, cause the applicable Permitted Sublessee to use) the Aircraft ... solely in commercial operations ... for which Lessee (or such Permitted Sublessee, as the case may be) is duly autho-

rized ..." [67] It maintains that "use" means "operate" and that Section 5.3 therefore necessarily is inconsistent with any view of Section 7.1(c) that would prohibit AMI from flying the airplane. As AMI's Quinn effectively admitted, however, "use" does not necessarily mean "operate." He testified that AMI "used" the aircraft by having its agreed operator, Ryan, fly the plane to carry cargo.[68] Hence, Section 5.3's reference to "use" of the aircraft by the lessee does not necessarily support AMI's contention that the lease contemplated that AMI could fly the aircraft if it met legal requirements to do so. The best that can be said is that Section 5.3 itself is susceptible of two interpretations, one leading to AMI's preferred result and the other not.

Finally, AMI points to Section 4.2,[69] which in relevant part provides as follows:

> "[E]ach party represents and warrants to the other, as to itself, that:
>
> "(a) ... (ii) Lessee only represents and warrants that it or the Permitted Sublessee that will operate the Aircraft (A) is and covenants that through the Term it will remain or cause such Permitted Sublessee to remain duly certificated as an air carrier of cargo under the laws of the United States; and (B) operates and will throughout the Term continue to operate or cause such Permitted Sublessee to operate the Aircraft in accordance with the rules and regulations of the FAA and the CAA ..."

As is readily apparent, this clause is less than pellucid. It begins by representing and warranting that either AMI or the Permitted Sublessee-operator at the time of the signing of the lease satisfied certain conditions and would continue to do so during the term. AMI, however, did not satisfy any of those conditions when the Head Lease was signed—it was not duly certificated as an air carrier of cargo and it did not operate the aircraft in accordance with FAA and CAA rules. In view of this fact, one permissible

---

**64.** Def. Mem. Ex. A, § 19.15.

**65.** 14 C.F.R. § 1.1 (1998).

**66.** *Id.*

**67.** Def. Mem. Ex. A, § 5.3.

**68.** Burdette Supp. Aff. Ex 4 (Quinn Dep.), at 64–65.

**69.** Def. Mem. Ex. A, § 4.2(a).

reading of Section 4.2(a)(ii) is that the clause does no more than embody AMI's representation and warranty that the Permitted Sublessee-operator at the time the Head Lease was signed—Ryan—was duly certificated, would remain duly certificated, operated the aircraft in accordance with FAA and CAA rules, and would continue to do so.

On the other hand, if Section 4.2(a)(ii) were so construed, why refer to the Lessee and the Permitted Sublessee-operator in the disjunctive? That is, why have AMI represent and warrant that *either* it or the Permitted Sublessee-operator was and would remain duly certificated and operating within FAA and CAA rules? AMI argues that this aspect of the clause necessarily means that the Head Lease contemplated the possibility that AMI would operate the aircraft if Ryan ceased doing so and AMI became qualified. Perhaps. But the construction outlined in the preceding paragraph—that either AMI or the Permitted Sublessee-operator was duly qualified at the outset of the lease and that whichever satisfied that condition would continue to do so—also is plausible and consistent with TPL's proposed interpretation of Section 7.1(c). So Section 4.2(a)(ii) does not get AMI all the way home.

The most that can be said, then, for the other clauses of the Head Lease to which AMI points is that two of them arguably are consistent with, but do not compel, the conclusion that the parties agreed that AMI could operate the aircraft if it became duly qualified. On the other hand, construction of Section 7.1(c) in the manner suggested by TPL is not the only plausible result either.

As the parties agreed at argument, Ryan lawfully may operate the aircraft only so long as it is "duly qualified to operate the Aircraft under applicable Law." Thus, reading Section 7.1(c) as TPL suggests—that is, as meaning that Ryan and Ryan alone may fly the aircraft—leaves open the possibility that *no one* would be permitted to operate the plane if Ryan for some reason ceased to be "duly qualified" to do so "under applicable Law." In other words, TPL's reading necessarily leads to the conclusion that loss of qualification by Ryan would require that the aircraft remain idle unless, of course, the parties to the Head Lease amended the agreement. While that result is possible, one should not leap quickly to the conclusion that AMI agreed that it would continue to pay rent for the aircraft throughout the term while leaving open the possibility that Ryan's termination or loss of qualification would render the airplane inoperable except with the further agreement of TPL.

In the last analysis, the parties here have advanced two plausible interpretations of the Head Lease, each with its strong and weak points. TPL's proposed interpretation is faithful to the plain language of Section 7.1(c) but is subject to the objections that (1) it would require AMI either to renegotiate the lease or leave the plane idle if Ryan for some reason no longer could fly, and (2) there are other clauses of the lease that arguably are consistent with the possibility that AMI in some circumstances itself might operate the airplane. AMI's proposed interpretation, on the other hand, does violence to the language of Section 7.1(c) but draws modest support from other terms of the lease. In these circumstances, the Court holds that the Head Lease is ambiguous and that parol evidence is admissible to assist in resolving the ambiguity.

### B.  The Ambiguity Resolved

█  Fortunately, the parol evidence readily resolves this dispute.

First, as indicated above, the issue whether someone other than Ryan might operate the plane in the event Ryan were terminated or lost its certification came up during the negotiations. AMI proposed that Section 7.1(c) be changed to read that "Ryan ... or other operator will operate the Aircraft and will remain" duly qualified to do so. SBA rejected that proposal and insisted that Ryan be the only operator approved in the Head Lease. The parties agreed that if Ryan ceased to operate the airplane, the lessor would have the right to approve or disapprove any proposed replacement. AMI thus took the risk that the lessor would not approve any given proposed replacement including itself.

Second, the drafting history explains the references in the Head Lease that contemplate possible operation of the aircraft by the Lessee. This lease, a single spaced, typewritten document of more than 80 pages, obviously was prepared from a form or precedent used in prior transactions involving different parties.[70] The form or precedent presupposed that the lessee was duly qualified to operate the aircraft, as is evident from the original versions of Section 7.1(c) and, arguably, 4.2(a), among others. AMI's Quinn noted this error in his review of the first draft of Section 7.1(c). His comments led to the redrafting of that provision to delete any reference to the lessee as then being qualified to operate and to the insertion of the clause requiring that Ryan operate the plane. Neither side noted the issue with respect to other provisions of the lease. Indeed, none of the clauses relied upon by AMI and discussed above were changed in any material respect from the first draft to the executed version. Thus, to whatever extent other provisions of the lease contemplate possible operation of the plane by the lessee, they clearly do so in consequence of sloppy contract preparation rather than in reflection of any agreement the parties actually made.

No doubt AMI would respond to this view by citing the maxim, referred to above, that a contract should be construed to give effect to every part of its language and that the Court's view disregards those provisions of the lease that contemplate operation by the lessee. But that argument fails here for several reasons.

First, as the discussion in the preceding section shows, the clauses relied upon by AMI, to the extent that they are relevant at all to the issue whether AMI may operate the aircraft, are no more consistent with that view than the one adopted by the Court.

None is rendered meaningless by the construction the Court adopts.

■ Second, AMI's position runs afoul of two other important principles of contractual interpretation—in case of conflict, (1) specific words and clauses control the general,[71] and (2) "separately negotiated or added terms are given greater weight than standardized terms or other terms not separately negotiated." [72] Here, the Section 7.1(c) requirement that Ryan operate the aircraft is specific and was separately negotiated. It therefore is entitled to greater weight than provisions of the lease that simply were adopted from a prior form and that do no more than contemplate the possibility that a lessee might operate the aircraft.

■ Finally, it must be borne in mind that canons of construction are not means to maintain a logically pure legal construct. They are tools used, where appropriate, to achieve the paramount object of courts faced with contracts of uncertain meaning—determination of the intention of the parties.[73] While the canons of construction, properly applied, point to the same result, the direct evidence in this case—the history of Section 7.1(c)—unmistakably leads this Court to find that these parties intended that no one but Ryan International operate this aircraft absent amendment of the Head Lease.

### III

AMI next argues that even if it is obliged by the Head Lease to have the aircraft operated only by Ryan, the Court should not enforce its covenant by the remedy of injunction on the theory that TPL will suffer no irreparable injury if an injunction is denied. In other words, it asks the Court to countenance its prospective breach of the Head Lease to the extent of remitting TPL to a claim for damages for breach rather than requiring that AMI live up to the bargain it

---

**70.** Neither the lessor nor the lessee ever had engaged in such a transaction before.

**71.** *Bank of Tokyo–Mitsubishi, Ltd. v. Kvaerner,* 243 A.D.2d 1, 8, 671 N.Y.S.2d 905, 910 (1998); *Muzak Corp. v. Hotel Taft Corp.,* 1 N.Y.2d 42, 46, 150 N.Y.S.2d 171, 173, 133 N.E.2d 688 (1956).

**72.** RESTATEMENT (SECOND) OF CONTRACTS § 203(d) (1981).

**73.** *Thaddeus Davids Co. v. Hoffman–La Roche Chemical Works,* 97 Misc. 33, 35, 160 N.Y.S. 973, 974 (N.Y.Sup.Ct.1916), *rev'd on other grounds,* 178 A.D. 855, 166 N.Y.S. 179 (1st Dep.1917); *Mercantile Nat. Bank of City of New York v. Heinze,* 75 Misc. 551, 135 N.Y.S. 962, 969 (Sup. Ct.1912).

made. But there is no equity in AMI's position.

The governing standard is clear enough. Generally, to obtain a permanent injunction the applicant must show the absence of an adequate remedy at law and a threat of irreparable harm if the relief is not granted.[74] Irreparable injury in this context means only that the plaintiff must show that, absent an injunction, " 'the harm that has or will occur cannot be repaired.' " [75] The legal remedy of damages is inadequate if damages would be difficult to estimate [76] or if a monetary award would not remedy the damage caused.[77] Moreover, it is important to recognize, notwithstanding the common vocabulary used in articulating the standards for relief at the preliminary injunction and final determination stages, that the considerations bearing on the availability of injunctions:

> "are quite different at the two stages of litigation. Denying relief at the preliminary stage protects defendant's right to a full hearing, and a stringent variation of the irreparable injury rule lets the court openly balance the risks to each side. Preliminary relief is best considered as a separate issue, only distantly related to the choice of remedy at final judgment.
>
> "At the stage of permanent relief, specific relief is problematic only occasionally. Sometimes it imposes undue hardship or interferes with countervailing rights." [78]

Further, in assessing the adequacy of damages, it is important to bear in mind that "[d]oubts should be resolved in favor of granting specific enforcement or injunction," [79] as doing so serves the expectation interests of the contracting parties.

In this case, TPL plainly is threatened with irreparable injury for which it has no adequate remedy at law. TPL and its predecessor leased this valuable aircraft on the condition that it be flown and maintained by Ryan, an experienced operator with a well known track record, and no one else. In doing so, it reached its own assessment of the risks it was prepared to run. If the Court were to deny injunctive relief, the effect of doing so would be to force TPL to bear the risk of having the airplane flown and maintained by AMI, which has never engaged in those activities before. There simply is no way to quantify the extent of the damage inherent in that alteration of the balance of risks inherent in the aircraft lease.

AMI rejoins that there really is no cognizable risk because the possibility of a crash or other casualty is speculative, the airplane is insured, and the craft could be replaced easily if need be. In so arguing, however, it overlooks a good deal.

To begin with, the likelihood that the risk of the loss of the aircraft is small, no matter who operates it, ignores the point made above. TPL and its predecessor bargained for a specific operator and thus for a perceived level of risk acceptable to them. There is little justification for permitting AMI to deprive them of the benefit of their bargain, particularly where it is impossible to quantify the extent of the harm, if any, that doing so would impose upon them.

Second, AMI's focus on the possibility of a crash ignores other sources of risk. Multiengined jet planes are sensitive pieces of

---

**74.** *New York State Nat. Org. for Women v. Terry,* 886 F.2d 1339, 1362 (2d Cir.1989), *cert. denied,* 495 U.S. 947, 110 S.Ct. 2206, 109 L.Ed.2d 532 (1990); *Bronx Auto Mall, Inc. v. Am. Honda Motor Co.,* 934 F.Supp. 596, 612–13 (S.D.N.Y. 1996), *aff'd on opinion below,* 113 F.3d 329 (2d Cir.1997).

**75.** *Bronx Auto Mall, Inc.,* 934 F.Supp. at 613 (quoting 11 A CHARLES ALAN WRIGHT, ARTHUR R. MILLER MARY KAY KANE, ET AL., FEDERAL PRACTICE AND PROCEDURE: CIVIL 2D § 2944, at 95 (1995)); *accord, Studebaker Corp. v. Gittlin,* 360 F.2d 692, 698 (2d Cir.1966) (Friendly, J.).

**76.** *See Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 585, 72 S.Ct. 863, 96 L.Ed. 1153

(1952); *Nemer Jeep–Eagle, Inc. v. Jeep–Eagle Sales Corp.,* 992 F.2d 430, 436 (2d Cir.1993); *Rosenfeld v. W.B. Saunders,* 728 F.Supp. 236, 244 (S.D.N.Y.1990) (citations omitted), *aff'd,* 923 F.2d 845, (2d Cir.1990).

**77.** *JSG Trading Corp. v. Tray–Wrap, Inc.,* 917 F.2d 75, 79 (2d Cir.1990).

**78.** *Bronx Auto Mall, Inc.,* 934 F.Supp. at 613 (quoting Douglas Laycock, *The Death of the Irreparable Injury Rule,* 103 HARV. L. REV. 687, 691–92 (1990)) (footnotes and internal quotation marks omitted).

**79.** RESTATEMENT (SECOND) OF CONTRACTS § 359, cmt. a., at 169 (1981).

equipment requiring extensive and complex maintenance. Evidence before the Court indicates that in the brief period in which the aircraft was within AMI's control, AMI failed to follow appropriate maintenance procedures.[80] The risk that this start-up operation would fail to do so in the future is material.

Third, AMI is wrong in asserting that this aircraft could be replaced easily if the need arose. Indeed, the very fact that it is waging this expensive and difficult battle to gain control of the plane for itself, as opposed to acquiescing in termination of the lease and finding its own aircraft, demonstrates that an alternative is not readily to be found.

This is confirmed by the extensive evidence before the Court on the issue of whether this aircraft is replaceable in practical terms. This is a Boeing 727–232 aircraft with JT8D–17 engines and bearing FAA registration number N17789. It has two characteristics that make it especially attractive in the realm of cargo transport. Its "N" registration allows it to fly to any destination in the United States through the end of 1999, a characteristic not shared by aircraft not so registered.[81] Second, the plane is not subject to FAA directives regarding weight. With its cargo load capacity of approximately 50,000 pounds, it can transport roughly twice the weight of other aircraft lacking this combination of characteristics.[82] Thus, any proposed replacement, to be fully comparable, would have to have equivalent capacity and the same right to fly within the United States. While other carriers own comparable planes, the evidence shows that none is available on the market.[83] Given the difficulties identified by TPL, the Court finds that this aircraft probably could not be replaced with another of comparable capacity and registration characteristics should the need arise.

The likely irreplaceability of this aircraft with an equal is very significant here. While it is true that TPL would not have use of this aircraft for the remaining six months of the lease even if there were no breach by AMI, one must look beyond the termination date in order to appreciate the added risk it is being asked to run. If this aircraft were seriously damaged or lost between now and the end of the lease in May 1999, TPL might well be left without an aircraft and without the practical ability to replace it. It would lose or risk losing whatever business opportunities it might have for that post-termination period. And it would be unable, as a practical matter, to obtain compensation for them from AMI because the Head Lease specifically excludes recovery of consequential damages resulting from any breach of the lease.[84]

In view of all the circumstances, the Court finds that TPL is threatened with irreparable harm for which it has no adequate remedy at law. The denial of an injunction would force it to assume risks that its bargain specifically sought to avoid. The extent of those risks are largely if not entirely unquantifiable. Hence, there is no way to render them compensable in money. Even if there were, the lease's exclusion of consequential damages would leave TPL unprotected in quite substantial respects.

## IV

Count IV of the complaint seeks a declaration that TPL will be entitled to exercise any of its rights and remedies for an Event of

---

**80.** Burdette Aff. Ex 2 (Ryan Decl.), ¶ 8; Burdette Supp. Aff. Ex 9 (Kaminsky Letter).

**81.** Burdette Aff. Ex. 1 (Chickering Decl.), ¶ 18.

**82.** *Id.*

**83.** *Id.*
AMI has submitted evidence purportedly establishing the contrary but it is singularly unpersuasive. Two declarations, one of which refers to a Boeing listing of available planes, and an excerpt from something called *SpeedNews* together assert that a number of allegedly comparable planes are for sale and that dozens more could be converted to freight use in about three months. Def. Mem. Exs. L (Ruthenberg Decl.), M (LeaVell Decl.), N. Close examination, however, reveals these claims to be baseless. None of the planes listed in *SpeedNews* are freighters. Burdette Supp. Aff. Ex. 2 (Jackson Decl.) ¶ 6. While the Boeing list notes three freighters available for sale, one does not have an "N" registration and the other two have lower cargo capacity than the plane at issue here. *Id.* ¶ 8. Moreover, the Court is persuaded by TPL's submissions that conversion of passenger aircraft no longer is feasible in light of a recent FAA Notice of Proposed Rule Making. Burdette Supp. Aff. Ex. 3 (Alvarez Decl.) ¶¶ 1, 3, 5, 6.

**84.** Def. Mem. Ex. A, § 19.14.

Default—including termination of the Head Lease and retention of amounts held as reserves—if AMI fails to remedy its alleged breach of Section 7.1(c) on or before November 18, 1998, a date since extended by agreement to the earlier of (a) December 4, 1998, and (b) the day following the rendition of this decision.

At first blush, the issue whether AMI has breached Section 7.1(c) of the Head Lease and, if so, whether this breach will mature into an Event of Default justifying termination, as TPL claims, appears to be the same as that already discussed. On closer inspection, however, this is not so.

Section 7.1(c) is AMI's covenant that Ryan—and, by necessary implication, not AMI—will operate the aircraft. The discussion thus far has focused on whether operation of the plane by AMI would breach that covenant. But the issue presented on the declaratory judgment claim is different. It is whether the failure to have Ryan fly the plane since October 15, 1998, constituted a breach of the Head Lease, given that the airplane has not left the ground in the interim.

The answer to this question is not self evident. TPL appears to have little interest in whether the airplane actually is flown as long as it receives its lease payments and the plane is properly stored. In any case, however, the parties have not briefed this issue. Nor have they addressed the other question raised by the declaratory judgment claim, viz. whether retention of the reserves is an appropriate remedy.

■ Declaratory judgments are matters of discretion, not of right.[85] Where, as here, the parties have failed adequately to present the issue to the Court, it would be inappropriate for the Court to set sail on an uncharted sea. Accordingly, the prayer for a declaratory judgment will be dismissed without prejudice in the exercise of the Court's discretion.

*Conclusion*

For the foregoing reasons, plaintiff is entitled to a judgment of permanent injunction barring AMI from operating the aircraft absent amendment of the Head Lease permitting it to do so and otherwise following the terms of the temporary restraining order. Count IV is dismissed without prejudice. As issues concerning AMI's counterclaims may remain unresolved, an interlocutory judgment will enter. The foregoing contains the Court's findings of fact and conclusions of law.[86]

SO ORDERED.

---

**85.** *E.g., Wilton v. Seven Falls Co.,* 515 U.S. 277, 115 S.Ct. 2137, 2140, 132 L.Ed.2d 214 (1995); *Agency Rent A Car System, Inc. v. Grand Rent A Car Corp.,* 98 F.3d 25, 32 (2d Cir.1996); *In re Orion Pictures Corp.,* 4 F.3d 1095, 1100 (2d Cir. 1993), *cert. denied,* 511 U.S. 1026, 114 S.Ct. 1418, 128 L.Ed.2d 88 (1994); *Goldberg v. Win-* ston & Morrone, P.C., No. 95 Civ. 9282(LAK), 1997 WL 139526, at *3 (S.D.N.Y. Mar. 26, 1997).

**86.** AMI does not contest TPL's request for injunctive relief regarding the second and third causes of action, assuming that it is entitled to relief on the underlying claim.