Ramin KAMFAR, Plaintiff,

v.

**NEW WORLD RESTAURANT GROUP, INC. f/k/a New World Coffee–Manhattan Bagel, Inc., et ano., Defendants.**

### No. 03 Civ.4076 LAK.

United States District Court,
S.D. New York.

Dec. 9, 2004.

Paul F. Carvelli, John F. Tully, McCusker, Anselmi, Rosen, Carvelli & Walsh, P.C., for Plaintiff.

Paul R. DeFilippo, Mathew B. West, Todd E. Duffy, Wollmuth Maher & Deutsch LLP, for Defendants.

### MEMORANDUM OPINION

KAPLAN, District Judge.

Ramin Kamfar was the founder, chief executive officer, and chairman of New World Restaurant Group, Inc. ("New World" or the "Company"). He left the Company in April 2002 amid questions about the propriety of bonus payments he and other officers had received. The agreement governing the terms of Kamfar's departure included a confidentiality provision, a non-disparagement provision, and a covenant not to sue. After Kamfar's

departure, the defendants described the disputed payments in various public statements as "unauthorized." Kamfar challenges those statements in this diversity action for breach of contract and defamation. The defendants allege in a counterclaim that Kamfar has breached the covenant not to sue by bringing this action. The matter now is before the Court on defendants' motion for summary judgment dismissing the complaint and plaintiff's motion for summary judgment dismissing the counterclaim.

## Facts

### A. Background

New World, a Delaware corporation with its principal place of business in Colorado, is a public company that operates a chain of coffee stores.[1] Kamfar, a resident of New York, founded the Company in 1993, was chief executive officer from 1996 to 2001, and chairman from December 1998 until his departure on April 1, 2002.[2] Defendant Anthony Wedo was hired as chief executive officer in August 2001, became chairman upon Kamfar's departure, and remained in that position throughout the events at issue in this action.[3]

In 2000, New World was immersed in a protracted effort to acquire the Einstein/Noah Bagel Corporation ("Einstein"), which had filed for bankruptcy.[4] That year Kamfar, prompted by Michael Konig, New World's general counsel, proposed to New World's board of directors a bonus plan to compensate certain employees who had been working intensively on the Einstein acquisition, including Kamfar himself, Konig, and chief financial officer Jerold Novack. The plan eventually included a bonus to be paid if the acquisition was completed and a bonus to be paid if the relevant employees were dismissed following a change of control in connection with the acquisition.[5]

The plan was discussed by the Compensation Committee in December 2000[6] and eventually, in an attachment to an email message, forwarded with no explanation in April 2001 to the board,[7] which never actually discussed it.[8] The beneficiaries of the plan eventually received bonus payments totaling $3.5 million; Kamfar's share was $1,620,000.[9] The board of directors was not aware of these payments, some of which were in the form of advances in cash and stock before the bonuses had actually vested under the plan.[10] The bonus plan was not disclosed in any of New World's public filings or private financing contracts.[11]

1. Def. 56.1 St. ¶¶ 3, 5; Pl. 56.1 St. ¶¶ 3, 5; Kamfar Decl. ¶ 3. The Local Rule 56.1 Statements cited in this opinion are those submitted in connection with the defendant's motion for summary judgment.

2. Def. 56.1 St. ¶ 1; Pl. 56.1 St. ¶ 1; Cpt. ¶ 4; Kamfar Decl. ¶ 3.

3. Def. 56.1 St. ¶ 8; Pl. 56.1 St. ¶ 8; Kamfar Decl. ¶ 32; Duffy Decl. Ex. R; Wedo Decl. ¶ 4.

4. Def. 56.1 St. ¶ 61; Pl. 56.1 St. ¶ 61; Kamfar Decl. ¶ 7.

5. Kamfar Decl. ¶¶ 8–13; Barket Decl. ¶ 13 & Ex. B; McCabe Decl. ¶ 12.

6. Barket Decl. ¶ 17; McCabe Decl. ¶ 13; Def. 56.1 St. ¶¶ 74–75; Pl. 56.1 St. ¶¶ 74–75.

7. *See* Duffy Decl. Ex. C.

8. Duffy Decl. Ex. D; Barket Decl. ¶ 21; McCable Decl. ¶ 16; Def. 56.1 St. ¶ 94; Pl. 56.1 St. ¶ 94.

9. Allen Decl. ¶ 18; Duffy Decl. Ex. I.

10. *Compare* Def. 56.1 St. ¶¶ 103–115 *with* Pl. 56.1 St. ¶¶ 103–115.

11. Allen Decl. ¶¶ 18, 72, 74, 76.

The parties dispute vigorously, as they apparently have been doing since February 2002, whether the bonus plan was duly authorized. They dispute, among other things, whether the Compensation Committee had the authority to approve the bonus plan on its own, and whether, if it did not, the board of directors ever approved it. The Court finds it unnecessary to review the complicated factual history relevant to these issues.

The plan did not become a subject of controversy until February 15, 2002, when the Proskauer Rose law firm discovered it while advising New World on several unrelated matters.[12] Proskauer, after discussion with the board, launched an investigation.[13] The investigation, which was conducted over several weeks, involved more than twenty attorneys who together spent more than 2,200 hours reviewing approximately fifty boxes of documents, interviewing seventeen witnesses, and collecting and reviewing computer files.[14] Proskauer retained also forensic accountants, an information technology firm, and Delaware counsel.[15]

On March 7 and 15, 2002, Proskauer gave the board oral presentations on its findings. It advised the board, among other things, that the bonus payments had not been authorized and that the Company's financial statements would have to be restated in order to give the payments the appropriate accounting treatment.[16]

On April 1, 2002, Kamfar and New World entered into a settlement agreement (the "Agreement") pursuant to which Kamfar agreed to repay the $1,620,000 he had received in bonus payments, New World agreed to pay Kamfar $1,445,000, and Kamfar waived his right to severance payments under pre-existing contracts.[17] The parties agreed to release each other from any claims that they might have had against each other up to the date of the Agreement.[18]

The Agreement included also mutual covenants not to make disparaging statements, covenants not to sue, and an agreement to keep the terms and conditions of the Agreement confidential. The non-disparagement and confidentiality provisions included exceptions for disclosures that New World believes in good faith are "necessary or desirable to protect the Company's interests." The covenants not to sue included an exception for the parties' rights to enforce the Agreement.[19]

## B. The Defendants' Public Statements

On April 3, 2002, New World issued a press release announcing Kamfar's departure and his severance payment.[20] On May 31, New World filed its Form 10–K and issued a press release. Both disclosed

---

12. *See* Allen Decl. ¶¶ 12, 18; Def. 56.1 St. ¶¶ 11, 17; Pl. 56.1 St. ¶¶ 11, 17.

13. Def. 56.1 St. ¶¶ 20–24; Pl. 56.1 St. ¶¶ 20–24.

14. Allen Decl. ¶¶ 40–41, 44; DiCanio Decl. ¶¶ 44–48, 52.

15. Allen Decl. ¶¶ 42–43.

16. *See* Def. 56.1 St. ¶¶ 116–120; Pl. 56.1 St. ¶¶ 116–120; Allen Decl. ¶¶ 56, 80–85, Ex. F. at 4, Ex. G at 14.

17. Kamfar Decl. Ex. GG (the "Agreement") ¶¶ 3, 5.

18. *Id.* ¶ 6, Exs. E, F.

19. *Id.* ¶¶ 13, 15, 16.

20. The relevant text was:
 "Ramin Kamfar, Chairman, resigned from the Company … effective April 1, 2002, to pursue other business interests. In connection with his departure from the Company, New World paid Mr. Kamfar $1,445,000." Duffy Decl. Ex. R.

**44**

that the Company had revised its financial statements in order to give the proper treatment to "unauthorized bonus payments" of $3.5 million.[21]

Proskauer attorneys advised on the drafting and issuance of these documents.[22] Proskauer believed that the Company was obligated, pursuant to the securities laws, to disclose "the circumstances underlying the Restatements" and "the $1,445,000 in compensation that Mr. Kamfar received as part of the Settlement Agreement."[23]

On June 4 the *Asbury Park Press* (*"APP"*), a New Jersey newspaper, published an article about New World which attributed to Anthony Wedo, Kamfar's successor as chairman, a statement identifying Kamfar as one of the recipients of unauthorized bonuses.[24] New World's public relations consultant, William Parness, testified that he, on behalf of Wedo, communicated with the reporter in connection with the article[25] and that Wedo provided the reporter with the information that Kamfar was a recipient of the bonuses.[26]

On June 24, 2002, Wedo held a conference call with analysts and shareholders in which he made statements about the bonuses that conveyed substantially the same information as the statements in the May 31 press release and the 10–K filing.[27] Proskauer attorneys helped Wedo prepare for the call.[28] On the following day, the *APP* published another article on New World. This article, which reported on the conference call, mentioned unauthorized

---

21. The 10–K stated:
 "In connection with the Einstein Acquisition, unauthorized bonus payments in the aggregate amount of $3.5 million were made to certain former executive officers and former employees.... All of these payments were originally recorded ... as part of the acquisition costs associated with the Einstein Acquisition and as a restructuring charge. We have revised the results for those quarters so as to reverse that treatment." Duffy Decl. Ex. T at 16.
 The press release stated:
 "The company also disclosed that it has revised operating results for the first three quarters of fiscal 2001.... The revisions reflect adjustments for unauthorized bonus payments to certain former executive officers and former employees.... The unauthorized bonus payments totaling $3.5 million were made in connection with the Einstein acquisition.... An aggregate of $2.5 million of those payments was offset against payments to be made in connection with the separation of certain officers and employees from the company." Duffy Decl. Ex. U at 2.

22. Allen Decl. ¶¶ 89, 94; Def. 56.1 St. ¶¶ 132, 139; Pl. 56.1 St. ¶¶ 132, 139.

23. Allen Decl. ¶ 99; *accord* Def. 56.1 St. ¶ 144; Pl. 56.1 St. ¶ 144.

24. The relevant text was:
 "The U.S. Justice Department has joined the Securities & Exchange Commission in probing the recent departures of two executives at Eatontown-based New World Restaurant Group after the company alleged that they and other employees had received bonus payments of $3.5 million that were never authorized by the company's board of directors.
 . . .
 "New World Chief Executive Officer Anthony Wedo would not identify everyone he claims received the $3.5 million in bonuses, but he said 75 percent of the total, or about $2.6 million, went to the company's former chairman, Ramin Kamfar, and its former chief financial officer, Jerrold Novack.
 "When he left the company, Kamfar retained $1.4 million as his severance, Wedo said." Duffy Decl. Ex. V.

25. Parness Dep. 44–48.

26. *See id.* at 48.

27. *See* Duffy Decl. Ex. X at 4–5.

28. *See* Duffy Decl. Ex. W; Parness Dep. at 66; Def. 56.1 St. ¶ 150; Pl. 56.1 St. ¶ 150.

bonuses again and referred to Wedo's earlier statement that Kamfar was one of the recipients.[29]

### C. This Action

Kamfar here asserts claims for defamation and breach of contract based on alleged violations of the confidentiality provision and the non-disparagement provision of the Agreement. The complaint challenges the statements in the *APP* articles; it does not refer to the press releases or the conference call.[30] Kamfar requests also declarations "that New World's Compensation Committee and Board of Directors had, in fact, authorized bonus agreements for plaintiff and Novack in the amount of $2.6 million" and that "nothing was improper or inappropriate about the $1.4 million paid to and received by plaintiff Kamfar as severance in accordance with the terms and conditions of the parties' April 1, 2002 settlement agreement."[31] The defendants subsequently counterclaimed for breach of Kamfar's covenant not to sue and for rescission of the Agreement. They assert also seven claims for relief arising out of Kamfar's alleged conduct prior to his departure.

### Discussion

### A. Summary Judgment Standard

Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.[32] The moving party has the burden of demonstrating the absence of a genuine issue of material fact,[33] and the Court must view the facts in the light most favorable to the nonmoving party.[34] Where the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim.[35] In that event, the nonmoving party must come forward with admissible evidence[36] sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment.[37]

---

**29.** The relevant text was:

"It cost ... New World Restaurant Group $1.7 million in legal expenses to investigate the payment of $3.5 million in unauthorized bonuses to two executives and some employees, the company said Monday.

. . .

"Wedo has said about $2.6 million of the $3.5 million in bonuses that were not authorized by the company's board of directors went to former Chairman Ramin Kamfar and former Chief Financial Officer Jerrold Novack. . . .

"Kamfar retained $1.4 million of the unauthorized bonus he received as his severance, the company said." Duffy Decl. Ex. Y.

**30.** *See* Cpt. ¶¶ 13, 14, 22.

**31.** *Id.* ¶¶ 35–39. The complaint included also a claim for punitive damages, but as the plaintiff concedes, *see* Pl. Mem. in Opp'n to Summ. J. Mot. 34, punitive damages is a potential remedy for defamation, not an independent cause of action.

**32.** Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *White v. ABCO Eng'g Corp.*, 221 F.3d 293, 300 (2d Cir.2000).

**33.** *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

**34.** *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Hetchkop v. Woodlawn at Grassmere, Inc.*, 116 F.3d 28, 33 (2d Cir.1997).

**35.** *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Virgin Atl. Airways Ltd. v. British Airways PLC*, 257 F.3d 256, 273 (2d Cir.2001).

**36.** *See, e.g., Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 269 F.3d 114, 123–24 (2d Cir.2001).

**37.** *E.g., Nebraska v. Wyoming*, 507 U.S. 584, 590, 113 S.Ct. 1689, 123 L.Ed.2d 317 (1993); *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir.1995).

## B. The Claims

### 1. Defamation

■ As an initial matter, the defendants argue that the defamation claim is time-barred because all of the allegedly defamatory statements were published before June 4, 2002.[38] According to the defendants, the statements made on or after June 4, 2002 were simply repetitions of the earlier ones, not new publications, and therefore are not actionable under the single publication rule.[39]

Even assuming that the defendants are correct about the application of the single publication rule, an issue as to which the Court expresses no opinion, the argument fails. In opposing summary judgment, Kamfar challenges only the statement, attributed to Wedo in the June 4 and June 25 APP articles, that Kamfar and Novack received $2.6 million in unauthorized bonuses. The defendants had not made that statement publicly before.[40] As this asser-

tion first appeared on June 4, it is within the limitations period.

The defendants argue that the record contains no admissible evidence that defendants actually made that statement. The Court disagrees. There is strong evidence that Wedo, through his publicist, communicated with the APP reporter and provided the information at issue in that article. The Court thus finds that the record contains evidence of defamatory statements made within the limitations period.

■ Defendants next seek dismissal on the ground that the plaintiff has not raised a genuine issue of fact as to fault. Under New York law, a private figure defamation plaintiff[41] suing on a statement that is "arguably within the sphere of legitimate public concern"[42] must demonstrate, among other things,[43] that the defendant "acted in a grossly irresponsible manner, without due consideration for the standards of information gathering and dissemination ordinarily followed by re-

38. This action was commenced June 4, 2003, and the statute of limitations for libel in New York is one year. N.Y. CPLR § 215, subd. 3 (McKinney 2004).

39. See, e.g., Firth v. State, 98 N.Y.2d 365, 369, 747 N.Y.S.2d 69, 70–71, 775 N.E.2d 463 (2002).

40. The May 31, 2002 press release and the 10–K filing stated only that unauthorized bonus payments totaling $3.5 million had been paid to "certain former executive officers and former employees."

41. The defendants argue that Kamfar is a public figure for purposes of matters relating to New World. Def. Mem. in Supp. of Summ. J. Mot. 30–32. This contention lacks merit. The limited public figure doctrine applies to individuals who " 'have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved.' " Huggins v. Moore, 94 N.Y.2d 296, 301–02, 704 N.Y.S.2d 904, 907, 726 N.E.2d 456 (1999) (quoting Gertz v. Robert Welch, Inc., 418 U.S. 323, 345, 94 S.Ct.

2997, 41 L.Ed.2d 789 (1974)). The limited attention Kamfar received as a successful entrepreneur—the defendants have submitted two profiles of him published in 1999, see Parness Decl. Exs. A, B—does not place him within the ambit of this doctrine.

42. Chapadeau v. Utica Observer–Dispatch, Inc., 38 N.Y.2d 196, 199, 379 N.Y.S.2d 61, 64, 341 N.E.2d 569 (1975). Kamfar concedes that the challenged statements are "arguably within the sphere of legitimate public concern." Pl. Mem. in Opp'n to Summ. J. Mot. 31.

43. The only other potentially relevant element of the defamation tort, see 2 NEW YORK PATTERN JURY INSTRUCTIONS-CIVIL 3:23A (2d ed.2004), is falsity of the allegedly defamatory statements. Elsewhere in this litigation, see Answer ¶ 51; Joint Pretrial Order ¶ 133, the defendants have taken the position that the challenged statements are true. They do not so assert for purposes of this motion.

sponsible parties." [44] The defendants argue that the plaintiff has failed to raise a triable issue as to whether the defendants acted with gross irresponsibility.

A number of New York cases have dealt with defamation claims arising out of a corporate employer's publication of the results of an internal investigation that the employer had commissioned from lawyers because the employer was concerned about potential employee misconduct.[45] In each case, the courts have found that the company's reliance on a thorough, responsible investigation negated the existence of gross irresponsibility as a matter of law.[46]

■ This case is no different. The undisputed evidence shows that the Proskauer attorneys who advised the board that the bonuses were unauthorized had conducted an extensive investigation. The meager evidence that the plaintiff cites in support of his contention that the investigation was deficient speaks, if at all, to the details of Proskauer's conduct of the investigation, not whether it was grossly irresponsible of the defendants to rely on it.[47]

**44.** *Chapadeau*, 38 N.Y.2d at 199, 379 N.Y.S.2d at 64, 341 N.E.2d 569; *accord Lopez v. Univision Communications Inc.*, 45 F.Supp.2d 348, 360, 362 (S.D.N.Y.1999). The Court of Appeals in *Chapadeau* was faced with a media defendant, but other courts have extended the standard to cases involving non-media defendants. *E.g.*, *McGill v. Parker*, 179 A.D.2d 98, 108, 582 N.Y.S.2d 91, 97 (1st Dep't 1992); *Pollnow v. Poughkeepsie Newspapers, Inc.*, 107 A.D.2d 10, 16, 486 N.Y.S.2d 11, 16 (2d Dep't 1985), *aff'd on other grounds*, 67 N.Y.2d 778, 501 N.Y.S.2d 17, 492 N.E.2d 125 (1986); *Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d 92, 101–02 (2d Cir.2000).

**45.** *See Konikoff*, 234 F.3d at 94–95; *Mott v. Anheuser–Busch, Inc.*, 910 F.Supp. 868 (N.D.N.Y.1995), *aff'd mem.*, 112 F.3d 504 (2d Cir.1996); *Post v. Regan*, 677 F.Supp. 203 (S.D.N.Y.1988), *aff'd mem.*, 854 F.2d 1315 (2d Cir.1988); *Luisi v. JWT Group, Inc.*, N.Y.L.J., Sept. 18, 1987, at 7, 14 Media L. Rep. (BNA) 1731 (Sup.Ct.N.Y.Co.1987), *aff'd mem.*, 138 A.D.2d 987, 525 N.Y.S.2d 454 (1st Dep't 1988).

**46.** *See Konikoff*, 234 F.3d at 103–04 (defendant financial company distributed report written by law firm based on interviews with 85 employees and review of 50,000 documents); *Mott*, 910 F.Supp. at 875–76 (defendant did not act with gross irresponsibility where it released results of investigation confirming that employees at defendant's treatment plant had falsified data in reports to state environmental agency; investigation, which involved the company's environmental and legal personnel as well as outside counsel, interviews with all relevant parties, and extensive review of records, was "thorough and responsible"); *Post*, 677 F.Supp. at 209 (defendants reported on results of investigation conducted over two months involving "interviews of relevant parties and reviews of transactions and documents by inside and outside counsel, by staff and independent accountants, as well as by senior management"); *Luisi*, 14 Media L. Rep. (BNA) at 1733–34 (defendant, in press release, announced that an employee was responsible for accounting irregularities based on an investigation that extended over two months and was conducted by in-house and outside legal, accounting, and financial personnel who reviewed hundreds of thousands of documents and conducted over 50 interviews).

**47.** *See* Pl. Mem. in Opp'n to Summ. J. Mot. 31–32. In any event, the evidence is so trivial as to fail to raise a genuine issue of fact as to whether the investigation was thorough and responsible. The plaintiff argues that a memorandum by Proskauer attorney Arnold Jacobs to the investigation team stating "[t]he following supposes that certain matters will be resolved the way I think they will" demonstrates that the investigation was biased. The rest of the sentence, however, is: "but we will have to change the presentation as we continue to gather evidence and tailor the results to the facts as we know them at the Board meeting. None of this is to be construed as predetermining the facts before the investigation is complete." Carvelli Decl. Ex. H at 1. The Court finds the plaintiff's misleadingly selective quotation objectionable.

Kamfar complains also that Proskauer did not interview the attorney who drafted some of

The unrefuted evidence demonstrates that the defendants, in publicly characterizing the bonuses as unauthorized, did not act with gross irresponsibility. The claim for defamation must be dismissed.

### 2. Breach of Contract

#### a. Breach of the Confidentiality Provision

■ The confidentiality provision provides that the "terms and conditions of this Agreement are confidential." [48] The only actual term of the Agreement disclosed by the defendants was Kamfar's severance payment of $1,445,000. Kamfar, however, does not complain of this disclosure.[49] Nor does Kamfar challenge New World's disclosure of the *fact* and *amount* of his bonus [50] which, though not an actual term of the Agreement, is mentioned in it. Rather, Kamfar challenges only the *characterization* of his bonus as unauthorized.[51] Nowhere in the Agreement, however, are the bonuses described as unauthorized. The disputed statements, therefore, did not disclose any term or condition of the Agreement. As a matter of law, there was no violation of the confidentiality provision.

#### b. Breach of the Non–Disparagement Provision

■ The non-disparagement covenant provides, as relevant here:

"The Company covenants that its senior management and directors ... shall not at any time hereafter make any disparaging statements of any kind about Kamfar. The foregoing covenant shall not preclude the Company ... from disclosing information to the extent that the Company, in good faith, believes that such disclosure is necessary or desirable to protect the Company's interests...." [52]

In order to prevail on this claim, plaintiff therefore must establish both that the description of the bonuses as unauthorized was a "disparaging statement" and that the Company did not have a good faith belief that its characterization was necessary or desirable to protect its interests.

■ Under New York law, the initial interpretation of a contract is a matter of law for the court to decide.[53] Where the

---

New World's early corporate documents. The attorney's views of the documents, however, are irrelevant to the question of whether the bonuses were authorized; the documents speak for themselves.

Finally, Kamfar complains that the investigation did not result in specific findings of fact or a written report. No reasonable fact-finder, faced with all the undisputed evidence about the conduct of the investigation, could conclude that the decision to present the results orally rather than in writing rendered the investigation so deficient that defendants' reliance on its conclusions was grossly irresponsible. *Cf. Luisi v. JWT Group, Inc.*, N.Y.L.J., Sept. 18, 1987, at 7, 14 Media L. Rep. (BNA) 1732, 1733–34 (Sup.Ct.N.Y.Co. 1987) (defendants who relied on a thorough investigation that did not result in a written report had met *Chapadeau* standard).

**48.** Agreement ¶ 16.

**49.** The complaint challenged the disclosure of the severance, Cpt. ¶¶ 12, 15–19, but Kamfar abandoned that position in opposing summary judgment. *See* Pl. Mem. in Opp'n to Summ. J. Mot. 17, 24, 32.

**50.** *See id.* at 24–25.

**51.** *See id.*

**52.** Agreement ¶ 15(b).

**53.** *805 Third Avenue Co. v. M.W. Realty Assocs.*, 58 N.Y.2d 447, 451, 461 N.Y.S.2d 778, 780, 448 N.E.2d 445 (1983); *Fishler v. Fishler*, 2 A.D.3d 487, 488, 769 N.Y.S.2d 273, 275 (2d Dep't 2003); *Non–Linear Trading Co. v. Braddis Assocs., Inc.*, 243 A.D.2d 107, 114, 675 N.Y.S.2d 5, 10 (1st Dep't 1998); *see also Trans Pacific Leasing Corp. v. Aero Micronesia, Inc.*, 26 F.Supp.2d 698, 706 (S.D.N.Y. 1998).

agreement is unambiguous, a court may not admit extrinsic evidence and interprets the plain language of the agreement as a matter of law.[54]

The meaning of "disparaging statement," as used in the Agreement, is not self-evident.[55] Nor have defendants disputed, for purposes of this motion, that the characterization of the bonuses as unauthorized was disparaging. The Court therefore assumes without deciding that the challenged statements were disparaging.

Defendants do contend that the challenged disclosures were made in a good faith belief that they were necessary or desirable and that there is no genuine issue of fact as to this point.[56] They rely heavily on the facts that Proskauer advised New World on the drafting of the press releases and the 10–K and counseled that the Company was obligated to disclose Kamfar's severance and "the circumstances underlying the Restatements" of its financial statements. There is no evidence, however, that Proskauer advised New World to describe the bonuses as unauthorized. In any case, there is no suggestion that Proskauer ever advised Wedo to identify Kamfar in the June 4, 2002 article as a recipient of an unauthorized bonus.[57]

In these circumstances, it appears to be undisputed that New World disclosed that it had restated its financials to account properly for certain bonuses and that it did so in consultation with its Proskauer attorneys. It remains unclear whether the characterization of the bonuses as unauthorized was a product of good faith reliance on advice of counsel. And a trier of fact in any case could conclude that Wedo later named Kamfar as a recipient of an unauthorized bonus without a good-faith belief that disclosure of Kamfar's identity was necessary or desirable to protect the Company's interests. Accordingly, there are genuine issues of material fact as to the Company's good faith.

 Wedo stands in a different position because he was not a party to the Agreement. "Corporate officers may not be held personally liable on contracts of the corporation where they did not purport to bind themselves individually."[58] There

---

54. *Bethlehem Steel Co. v. Turner Const. Co.*, 2 N.Y.2d 456, 460, 161 N.Y.S.2d 90, 93, 141 N.E.2d 590 (1957); *Non–Linear Trading Co.*, 243 A.D.2d at 114, 675 N.Y.S.2d at 10; *Hanley v. Lark Deli Corp.*, 2 F.Supp.2d 534, 537 (S.D.N.Y.1998).

55. Black's Law Dictionary as relevant here defines "disparage" as "[t]o unjustly discredit or detract from the reputation of (another's property, product, or business)" and "disparagement" as "[a] false and injurious statement that discredits or detracts from the reputation of another's property, product, or business." BLACK's LAW DICTIONARY 483 (7th ed.1999). These definitions raise the question of whether a statement, to be "disparaging," must be inaccurate in some way. The Court does not now decide this issue.

56. Def. Mem. in Supp. of Summ. J. 16–20. Lack of the requisite belief for purposes of this contract is a different concept from the "gross irresponsibility" required to make out a claim of libel in New York. The latter is an objective standard of care in ascertaining the *accuracy* of information. The former is a mental state the existence of which gives rise to a claim for breach of contract. Thus, the defendants could have satisfied the *Chapadeau* standard and still breached the non-disparagement provision.

57. As discussed above, the Court rejects the defendants' argument that there is no admissible evidence of this statement.

58. *Lichtman v. Mount Judah Cemetery*, 269 A.D.2d 319, 320, 705 N.Y.S.2d 23, 25 (1st Dep't 2000); *accord Maranga v. McDonald & T. Corp.*, 8 A.D.3d 351, 351, 777 N.Y.S.2d 732, 733 (2d Dep't 2004).

is no suggestion here that Wedo purported to bind himself personally on the Agreement. Wedo therefore will be dismissed from the action.

### 3. Declaratory Relief

 Kamfar seeks a declaration "that New World's Compensation Committee and Board of Directors had, in fact, authorized bonus agreements for plaintiff and Novack in the amount of $2.6 million."[59] The issuance of declaratory relief is discretionary.[60] Issuing the declaration requested in this case would require the Court to adjudicate one of the very issues with respect to which the Agreement was supposed to avoid further litigation. In the exercise of discretion, the Court declines to grant declaratory relief.

### C. The Counterclaim

### 1. Breach of Contract

 Paragraph 13 of the Agreement provides, in relevant part:

"Except as to his right to enforce this Agreement, Kamfar covenants, to the maximum extent permitted by law, that he shall not at any time hereafter commence ... any action ... with respect to any actual or alleged act ... including, without limitation, any disclosures made publicly ... at any time regarding any subject matter against or concerning the Company, ... [or] ... [its] ... officers [or] directors...."[61]

The counterclaim alleges that Kamfar's assertion of claims for defamation and for declaratory relief violates this covenant.[62] Kamfar contends that all of his claims fall within the exception for his right to enforce the Agreement.

 Covenants not to sue, requiring that the obligor forbear from bringing any current or future claims against the obligee, are valid in New York.[63] The covenant at issue here is not ambiguous, and no material facts are in dispute. Kamfar undertook not to sue the Company except "to enforce [the] Agreement." Unlike a claim for breach of contract, neither a tort claim nor, in all likelihood, a claim for a declaration regarding issues that an agreement was supposed to have put to rest can be said to enforce that agreement. As a mat-

---

**59.** The other declaration Kamfar seeks, namely that the $1,445,000 severance payment was proper, is unnecessary. New World does not dispute the propriety of Kamfar's severance payment. Def. Mem. in Supp. of Summ. J. Mot. 33 n. 26.

**60.** *Wilton v. Seven Falls Co.*, 515 U.S. 277, 288–89, 115 S.Ct. 2137, 132 L.Ed.2d 214 (1995); *Dow Jones & Co., Inc. v. Harrods, Ltd.*, 346 F.3d 357, 359 (2d Cir.2003); *Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp.*, 98 F.3d 25, 32 (2d Cir.1996); *Trans Pacific Leasing Corp. v. Aero Micronesia, Inc.*, 26 F.Supp.2d 698, 712 (S.D.N.Y.1998).

**61.** Agreement ¶ 13(a).

**62.** The defendants argue also that Kamfar's claim for breach of contract, insofar as that claim asserts that New World (as opposed to New World's management and directors) made disparaging remarks, constitutes a breach of Kamfar's covenant not to sue. The defendants rely on the fact that the Agreement prohibits only disparaging statements by the "senior management and directors," not disparaging statements by the Company itself. Def. Mem. in Opp'n to Pl. Summ. J. Mot. 8–9. This argument borders on the ridiculous. The *Company* made the covenant, and Kamfar has alleged that both the Company and Wedo (a director and officer) made the alleged disparaging remarks. Cpt. ¶¶ 13, 14, 18. Kamfar's entire claim for breach of contract falls within his right to enforce the agreement.

**63.** *See, e.g.*, *Wilder v. Pa. R.R. Co.*, 245 N.Y. 36, 39, 156 N.E. 88 (1927); *McMahan & Co. v. Bass*, 250 A.D.2d 460, 461, 673 N.Y.S.2d 19, 21 (1st Dep't 1998); *Colton v. N.Y. Hosp.*, 98 M.2d 957, 963–66, 414 N.Y.S.2d 866, 871–73 (Sup.Ct.N.Y.Co.1979).

ter of law, Kamfar's defamation and, probably, his declaratory judgment claims were prohibited by his covenant not to sue. Relief, however, is another matter.

■■■■ A defendant normally may not recover damages—i.e., litigation expenses—for breach of a covenant not to sue unless the parties specifically intended such recovery.[64] The Second Circuit has stated that the

"primary function [of the usual covenant not to sue] is to serve as a shield rather than as a sword.... In the absence of contrary evidence, sufficient effect is given the usual covenant not to sue if, in addition to its service as a defense, it is read as imposing liability only for suits brought in obvious breach or otherwise in bad faith...."[65]

Here, the contractual language is silent, the breach is not obvious[66]—since the defamation claim arises out of the same conduct as the breach of contract claim[67]—and there is no evidence of bad faith.[68]

64. See Bellefonte Re Ins. Co. v. Argonaut Ins. Co., 757 F.2d 523, 529 (2d Cir.1985); Artvale, Inc. v. Rugby Fabrics Corp., 363 F.2d 1002, 1008 (2d Cir.1966); Knoll v. Equinox Fitness Clubs, No. 02 Civ. 9120(SAS), 2003 WL 23018807, at *9 (S.D.N.Y.2003).

A pair of decisions of lower courts of New York have assumed in passing that damages could be recovered for breach of a covenant not to sue. See Colton v. N.Y. Hosp., 53 A.D.2d 588, 589, 385 N.Y.S.2d 65, 66 (1st Dep't 1976); Rokeach Sales Corp. v. Funaro, 16 M.2d 386, 387, 185 N.Y.S.2d 107, 109 (Sup.Ct.N.Y.Co.1959). Judge Friendly's opinion in Artvale did not state explicitly whether its holding was based on New York or federal common law, but subsequent cases implicitly or explicitly have treated Artvale as expressing the Second Circuit's view of New York law on this issue. See Bellefonte Re Ins. Co. v. Argonaut Ins. Co., 586 F.Supp. 1286, 1288 (S.D.N.Y.1984), aff'd, 757 F.2d 523.

65. Artvale, 363 F.2d at 1008; accord Bellefonte, 757 F.2d at 529; Knoll, 2003 WL 23018807, at *9; le Cordon Bleu, S.A. v. BPC Publ'g Ltd., 451 F.Supp. 63, 71 (S.D.N.Y. 1978). The defendants in this case have not asserted that Kamfar's non-contract claims are barred by the covenant not to sue.

66. Cf. Lubrizol Corp. v. Exxon Corp., 957 F.2d 1302, 1305–07 (5th Cir.1992) (Lubrizol liable under New York law for litigation expenses because its action for fraud based on Exxon's affidavits in a related New Jersey action was found to be an "obvious" breach of a settlement agreement that, as described in a related opinion, Lubrizol v. Exxon Corp., 871 F.2d 1279, 1285 n. 8, contained a covenant not to assert "any claim or counterclaim made in the ... New Jersey action ... or which could

have been made based on any fact pleaded"); Cefali v. Buffalo Brass Co., 748 F.Supp. 1011, 1026–28 (W.D.N.Y.1990) (plaintiffs were liable for litigation expenses where court found that a suit "based on allegations of discrimination arising out of plaintiffs' termination" was "in obvious breach" of what the court described as a covenant not to sue on "any claims [the plaintiffs] might have ... as a result of their termination").

67. The claim for declaratory relief presents a closer question than the defamation claim, but even the former can be viewed as an attempt to enforce the confidentiality and non-disparagement provisions of an Agreement at least arguably intended to prevent the public attribution of wrongdoing to Kamfar. See Agreement ¶ 1 ("It is understood and agreed between the Parties that this Agreement is made as a matter of compromise of disputed claims, and this Agreement shall not be construed or interpreted in any manner whatsoever as an admission of fault or liability on the part of either Party.").

68. The defendants have offered no admissible evidence that Kamfar brought the non-contract claims in bad faith. The declaration of Michael Firestein, upon which the defendants rely, see Def. Mem. in Opp'n to Pl. Summ. J. Mot. 12–13, contains nothing remotely relevant besides the following assertion:

"I made Kamfar, through his attorneys, aware that the Company would be obligated ... to (a) disclose Kamfar's resignation, ... the circumstances surrounding [that event], including the relationship of [that event] to the Deal Bonuses, and (b) make whatever disclosures were required and

Accordingly, the claim for breach of contract will be dismissed.

### 2. Breach of the Covenant of Good Faith and Fair Dealing

■ "In general, under New York law, a duty of good faith and fair dealing is implicit in every contract. A claim of breach of [the duty of good faith and fair dealing], however, will be dismissed as redundant where the conduct allegedly violating the implied covenant is a predicate also for a claim for breach of an express provision of the contract." [69]

Kamfar's allegation of breach of the implied covenant of good faith and fair dealing is entirely duplicative of the allegation of breach of the express covenant not to sue and therefore will be dismissed.

### 3. Rescission

■ The defendants seek rescission of the Agreement on the ground that Kamfar's assertion of non-contract claims has defeated "the objective of the parties in entering into the Agreement." [70]

■ In general, rescission is appropriate to remedy a breach of contract only when the breach is "material and willful, or, if not willful, so substantial and fundamental as to strongly tend to defeat the object of the parties in making the contract. . . . If the party who seeks rescission has an adequate remedy at law, ordinarily he is not entitled to rescind. . . ." [71]

The defendants argue that New World entered into the Agreement because New World "sought a permanent end to public scrutiny of a chapter in its history" and because, "[a]lthough the Company believed that it had grounds to terminate Kamfar's employment for cause, it did not want to expose itself to the accompanying potential expense and publicity of protracted litigation." [72] Thus, the defendants argue, Kamfar has "rendered meaningless the very benefits the Settlement Agreement provided the Company" by asserting non-contract claims.[73]

The argument is frivolous. Even if the defendants' characterization of New World's motive for entering into the Agreement were believed, it would be evident that one of the major objects of the Agreement was to settle potential claims arising out of Kamfar's separation. Essential components of the Agreement were Kamfar's agreement to repay the $1,620,000 bonus, New World's agreement to pay Kamfar $1,445,000 severance, and Kamfar's release of the Company from any liability in connection with his termination.

necessary to make certain that its financial statements were correctly stated." Firestein Decl. ¶ 17.

This statement is a characterization of Kamfar's state of mind by someone without personal knowledge, and it does not allege that Kamfar was aware that New World would be obligated to make the only disclosure he challenges—namely, that the bonuses were unauthorized.

69. *Nat'l Westminster Bank plc v. Grant Prideco, Inc.*, 261 F.Supp.2d 265, 274–75 (S.D.N.Y. 2003) (internal citation omitted); *accord N.Y. Univ. v. Cont'l Ins. Co.*, 87 N.Y.2d 308, 320, 639 N.Y.S.2d 283, 290, 662 N.E.2d 763 (1995); *Bus. Networks of N.Y., Inc. v. Com-*
*plete Network Solutions Inc.*, 265 A.D.2d 194, 195, 696 N.Y.S.2d 433, 435 (1st Dep't 1999).

70. Answer ¶¶ 121–24.

71. *Callanan v. Keeseville, Ausable Chasm and Lake Champlain R.R. Co.*, 199 N.Y. 268, 284, 92 N.E. 747 (1910); *accord Rudman v. Cowles Communications, Inc.*, 30 N.Y.2d 1, 13, 330 N.Y.S.2d 33, 43, 280 N.E.2d 867 (1972); *Graham v. James*, 144 F.3d 229, 237 (2d Cir. 1998).

72. Def. Mem. in Opp'n to Pl. Summ. J. Mot. 3, 10–11.

73. *Id.* at 13.

Kamfar's assertion of non-contract claims does not affect these features of the Agreement, let alone constitute such a "substantial and fundamental" breach of the Agreement "as to strongly tend to defeat the object of the parties in making it." Moreover, the defendants do not argue that Kamfar's contract claim violated the Agreement, let alone that it is grounds for rescinding it.[74] Kamfar's claim for defamation arises out of precisely the same conduct as his contract claim and therefore does no more to defeat the purpose of the Agreement than does the contract claim. And the additional burden in defending against the claim for declaratory relief is trivial.

The claim for rescission will be dismissed.

### 4. First Seven Causes of Action

The first seven causes of action all are based on alleged conduct as to which the Agreement explicitly released Kamfar from liability.[75] The defendants concede that these causes of action are barred unless the Agreement is rescinded.[76] As there is no basis for rescinding the agreement, the first seven causes of action in the counterclaim fail as a matter of law.

### Conclusion

The defendants' motion for summary judgment dismissing the complaint [docket item 29] is granted to the extent that the first claim for relief, insofar as it alleges a breach of the confidentiality clause and names Anthony Wedo as a defendant, as well as the second, third, and fourth claims for relief, are dismissed. The defendants' motion for summary judgment is otherwise denied. The plaintiff's motion for summary judgment dismissing the counterclaim [docket item 14] is granted.

SO ORDERED.

**74.** The defendants actually concede only that the allegation of breach of the confidentiality provision, not the allegation of breach of the non-disparagement provision, falls within the exception to the covenant not to sue. However, as discussed above, *see supra* footnote 62, the argument that Kamfar breached the covenant not to sue in alleging breach of the non-disparagement provision cannot be taken seriously.

**75.** *See* Answer ¶¶ 83–120. The seven causes of action are for breach of fiduciary duty, breach of the duty of loyalty, conversion, unjust enrichment, fraud, violation of N.J.S.A. § 2A:38A–3, and violation of the federal Computer Fraud and Abuse Act, 18 U.S.C. § 1030.

**76.** Def. Mem. in Opp'n to Pl. Summ. J. Mot. 11.